BONITA HARRIS SMITH v. OLLEN BRUTON SMITH

No. 9126DC1287

(Filed 17 August 1993)

1. **Divorce and Separation § 117 (NCI4th)— equitable distribution—classification of property as separate or marital—appreciation or acquisition as focus of trial court**

If an asset is characterized as separate property that has increased in value during the marriage, the court's focus is on the appreciation occurring during the marriage and whether that appreciation was active or passive; on the other hand, if an asset is characterized as marital property to which a contribution of separate property was made, in which case it is of a dual nature having a marital and a separate property component, then the primary focus is on acquisition, not appreciation.

**Am Jur 2d, Divorce and Separation § 878 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

2. **Divorce and Separation § 117 (NCI4th)— equitable distribution—holding company owned by defendant—classification as separate property error**

In an equitable distribution case where the key asset in dispute was the Sonic Financial Corporation, a North Carolina corporation which served as a holding company for a variety of defendant's business interests, the trial court erred in characterizing Sonic as defendant's separate property which appreciated in value during the marriage, since Sonic did not even come into existence until after the parties had been married fifteen years, and the property owned by defendant prior to the marriage was not Sonic and was only a small part of what eventually became Sonic. The trial court should have focused on how and when defendant's interest in Sonic was acquired.

**Am Jur 2d, Divorce and Separation § 878 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

3. **Divorce and Separation § 123 (NCI4th)— equitable distribu-
   tion—property of dual nature—appreciation of separate
   property—failure to show whether active or passive—court's
   treatment appropriate**

   The trial court correctly recognized that defendant's in-
   terest in Sonic, a holding company for a variety of defendant's
   business interests, was of a dual nature, having both a marital
   property and a separate property component, and defendant
   showed by a preponderance of the evidence that part of his
   interest in Sonic was acquired through the use of, or in ex-
   change for, a contribution of his separate property, valued
   at the date of marriage at $1,196,862; however, defendant failed
   to show what amount, if any, of the increase in the value
   of that investment of his separate property occurring during
   the marriage was attributable to passive appreciation, and
   he was therefore entitled only to a return of the base amount
   of his contribution of separate property with no appreciation.
   Though such a return would not ordinarily be fair under the
   source of funds approach, it was the appropriate one in light
   of the evidence presented, and, additionally, there was ample
   competent evidence in the record to support the trial court's
   finding that all of the increase in value of defendant's separate
   property contributed toward acquisition of Sonic occurring dur-
   ing the marriage was due to active appreciation and therefore
   was marital property.

   Am Jur 2d, Divorce and Separation § 891.

   Divorce: equitable distribution doctrine. 41 ALR4th 481.

4. **Divorce and Separation § 117 (NCI4th)— equitable distribu-
   tion—redemption of stock—payment after separation—payment
   as marital property**

   The trial court properly found that although part of the
   payment for the redemption of stock was made after the date
   of the parties' separation, the proceeds received after the separa-
   tion were nevertheless marital property because they were
   from the sale of stock acquired during the marriage and sold
   prior to the date of separation and were received in exchange
   for marital property.

   Am Jur 2d, Divorce and Separation § 878 et seq.

   Divorce: equitable distribution doctrine. 41 ALR4th 481.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

5. **Divorce and Separation § 144 (NCI4th)— equitable distribution—stocks acquired during marriage—dividends paid during separation—failure to consider as distributional factor—error**

The trial court in an equitable distribution action did not err in failing to include in the marital estate $240,162 in dividend income received by defendant after the date of separation and prior to trial where the dividends were paid on stocks acquired during marriage and owned at separation; however, the court should have expressly considered defendant's receipt of this income as a distributional factor under N.C.G.S. § 50-20(c) in determining an equitable distribution of the marital property.

**Am Jur 2d, Divorce and Separation § 915 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

6. **Divorce and Separation § 141 (NCI4th)— equitable distribution—valuation of Charlotte Motor Speedway—no error**

The trial court in an equitable distribution action did not err in its valuation of the Charlotte Motor Speedway, a wholly-owned subsidiary and by far the most valuable asset of defendant's holding company, where the court valued CMS based on a sound, well-accepted methodology, the excess earnings approach; the court found it necessary to make adjustments to the valuation by defendant's expert of CMS utilizing the excess earnings methodology in order to fairly and properly value this asset, and those adjustments were sufficiently supported by the evidence and the findings made; and because the court reasonably approximated the net value of CMS based on competent evidence and a sound valuation methodology, its valuation should not be disturbed.

**Am Jur 2d, Divorce and Separation § 937 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

7. **Divorce and Separation § 141 (NCI4th)— equitable distribution—valuation of insurance company—no error**

In an equitable distribution action, there was no merit to defendant's contention that the adjustments made by the court concerning valuation of an insurance company, which was a wholly-owned subsidiary of defendant's holding company, were improper, were not supported by the evidence,

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

and that as a result the value set for the holding company was $2,157,000 more than it should be.

**Am Jur 2d, Divorce and Separation § 937 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

8. **Divorce and Separation § 141 (NCI4th)— equitable distribution—valuation of automobile dealership—no error**

The trial court in an equitable distribution action did not err in its valuation of an automobile dealership which was a wholly-owned subsidiary of defendant's holding company since the court valued the dealership by use of the industry standard approach; under that approach value is determined by adding the net "hard asset" value, which is the value of its hard assets minus its liabilities, and its "blue sky" value, which is determined by multiplying the average pre-tax income of the dealership by a franchise multiple of one to five; the multiple chosen is subjective and is based upon factors such as the type of franchise, its market performance, location, demographics, etc.; the multiples selected by the court were not arbitrarily chosen but were based on the court's consideration of appropriate factors and the evidence; and the values obtained with the use of the multiples selected by the court were adequately supported by the evidence.

**Am Jur 2d, Divorce and Separation § 937 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

9. **Divorce and Separation § 141 (NCI4th)— equitable distribution—valuation of automobile dealership—no error**

The trial court in an equitable distribution action did not err in its valuation of an automobile dealership which was a wholly-owned subsidiary of defendant's holding company where the trial court expressly recognized in its judgment that the hard asset value as determined by plaintiff's expert included intangible assets consisting of franchise rights and non-compete contractual rights; the court found that although it was a misnomer to include intangible assets within the "hard asset" value, it was not an inaccuracy since plaintiff's expert had not included those assets, which had a computable value, as part of a blue sky component; and the court's finding regarding the inclusion of the intangible assets in the hard asset value

of the business was thus supported by plaintiff's expert's testimony and is therefore conclusive on appeal.

**Am Jur 2d, Divorce and Separation § 937 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

**10. Divorce and Separation § 136 (NCI4th)— equitable distribution—valuation of real estate—no error**

Evidence consisting of the comparable range of values utilized by defendant's expert was sufficient to support the trial court's finding in an equitable distribution action that the fair market value of a particular parcel of real estate remained constant from the date of separation to the date of trial.

**Am Jur 2d, Divorce and Separation § 937 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

**11. Divorce and Separation § 136 (NCI4th)— equitable distribution—valuation of marital home—no error**

The trial court in an equitable distribution action did not err in placing a value on the marital home which was $25,000 higher than that placed on the home by defendant's expert, since testimony by the expert that she had made a $75,000 downward adjustment based on needed repairs, that it was difficult to estimate how much the repairs would cost, and that she estimated them to be between $50,000 and $75,000 was sufficient to support the court's finding regarding the appropriate adjustment to be made and the resulting higher value placed on the property.

**Am Jur 2d, Divorce and Separation § 937 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

**12. Divorce and Separation § 144 (NCI4th)— equitable distribution—plaintiff's lack of homemaker contributions—trial court's consideration adequate**

In an action for equitable distribution there was no merit to defendant's contention that the trial court erred in failing to consider his evidence regarding plaintiff's lack of homemaker contributions, since the court specifically found that both parties offered evidence on this factor, and the court considered the factor but chose not to give it any weight; furthermore,

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

the weight to be given any factor is a matter in the trial court's discretion, and the court on appeal could not say that the court's decision not to give greater weight to this particular factor was manifestly unsupported by reason.

Am Jur 2d, Divorce and Separation § 915 et seq.

Divorce: equitable distribution doctrine. 41 ALR4th 481.

13. **Divorce and Separation § 144 (NCI4th)— equitable distribution—plaintiff's alleged economic misconduct—trial court's consideration adequate**

The trial court in an equitable distribution action did not err in failing to find facts and consider evidence of plaintiff's alleged economic misconduct, since the offer of proof did not show that plaintiff's misconduct dissipated or reduced the value of marital assets or was related to the economic condition of the marriage, but the evidence was instead offered to prejudice the court against plaintiff based on her misconduct.

Am Jur 2d, Divorce and Separation § 915 et seq.

Divorce: equitable distribution doctrine. 41 ALR4th 481.

14. **Divorce and Separation § 154 (NCI4th)— equitable distribution—tax consequences—trial court's consideration adequate**

In an equitable distribution award, there was no merit to defendant's contention that the trial court erred in failing to consider the adverse tax consequences to him inherent in its distributive award, since the court found that neither party had offered evidence regarding specific tax consequences that might result from the equitable distribution, but that other evidence regarding taxes had been presented with respect to various points, which evidence the court considered; for the court to distribute the property consistent with the parties' stipulations and preferences, a sizable distributive award to plaintiff was obviously going to be required; despite this obvious result, defendant presented no evidence regarding the adverse tax consequences he claimed were inherent in the distributive award; and the tax consequences claimed by defendant were purely speculative and were not inherent in the distribution actually ordered.

Am Jur 2d, Divorce and Separation § 915 et seq.

Divorce: equitable distribution doctrine. 41 ALR4th 481.

15. **Divorce and Separation § 161 (NCI4th)— equitable distribution—distribution of postseparation appreciation of property—error**

The trial court in an equitable distribution action erred in distributing part of the postseparation appreciation of the marital property to plaintiff and thereby exceeded its authority. The postseparation appreciation should be considered as a distributional factor and, upon remand, the court may determine, after considering the existence of the postseparation appreciation in the value of the assets distributed to defendant, that plaintiff must receive a higher percentage of the marital property in order to achieve an equitable distribution.

**Am Jur 2d, Divorce and Separation § 915 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

16. **Divorce and Separation § 148 (NCI4th)— equitable distribution—defendant's payments for mortgage on marital home—method of factoring into distribution adequate**

There was no merit to defendant's contention that payments made by him toward the first mortgage on the parties' marital home should be included in the postseparation appreciation of the home, since the court chose to give defendant credit for those mortgage payments at another point in its calculations.

**Am Jur 2d, Divorce and Separation § 915 et seq.**

**Proper date for valuation of property being distributed pursuant to divorce. 34 ALR4th 63.**

17. **Divorce and Separation § 144 (NCI4th)— equitable distribution—postseparation appreciation to marital property—classification as to active or passive not required of trial court**

Although it is appropriate and desirable for the trial court in determining an equitable distribution to take into consideration whether the postseparation appreciation of the marital property is passive appreciation, or resulted from the efforts of one or both spouses, the court is not required to make specific findings of fact classifying the appreciation as either passive or active.

**Am Jur 2d, Divorce and Separation § 915 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

18. **Divorce and Separation § 155 (NCI4th)— equitable distribution—interest payments on first mortgage—discharge of second mortgage—calculation of award improper**

The trial court in an equitable distribution action did not err in refusing to give defendant a credit or reimbursement for the interest portion of his mortgage payments, and did not err in reimbursing defendant in full, by way of a credit, for his payment of the property taxes due on the marital home; however, defendant was erroneously given double credit for his discharge of the second mortgage where defendant was given full credit for his discharge of the second mortgage and was awarded the house, which had increased in net value by $189,956 as a result of the discharge of the second mortgage, but the trial court did not include the amount of the second mortgage in the total of the postseparation appreciation of the marital property, thereby depriving plaintiff of the benefit from the increase in value of the home to which she was entitled.

**Am Jur 2d, Divorce and Separation § 915 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

19. **Divorce and Separation § 147 (NCI4th)— equitable distribution—marital debts distributed to defendant—no error**

The trial court did not abuse its discretion in distributing all of the marital debts to defendant since defendant was also awarded all of the property to which the debts were attached, except the residence purchased for plaintiff; the existence of the debt was included in the calculation of the net value of that property; and the only part of the assigned debt which was not taken into consideration in valuation of the marital property was approximately $6,000,000, representing debts owed to defendant's holding company and its subsidiary, the Charlotte Motor Speedway, entities subject to defendant's control and manipulation.

**Am Jur 2d, Divorce and Separation § 915 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

20. **Divorce and Separation § 165 (NCI4th)— equitable distribution—$15 million award over ten years—award proper**

The trial court in an equitable distribution action did not err in ordering defendant to pay a distributive award of over

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

$15 million over a period of ten years where the findings
made by the court regarding the need to extend payment
of the distributive award over a period in excess of six years
after the date of cessation of the marriage and regarding de-
fendant's ability to pay the award were adequately supported
by the record and sufficiently supported the award as ordered.

**Am Jur 2d, Divorce and Separation § 340 et seq.**

**Divorce: equitable distribution doctrine. 41 ALR4th 481.**

Judge GREENE concurring in part and dissenting in part.

Appeal by plaintiff and defendant from judgment entered 5
April 1991 by Judge L. Stanley Brown in Mecklenburg County
District Court. Heard in the Court of Appeals 3 December 1992.

Plaintiff and defendant both appeal from a judgment of equitable
distribution. The parties were married on 6 June 1972, separated
on 24 June 1988, and were granted an absolute divorce on 5 February
1990. Prior to the trial on their respective claims for equitable
distribution, the parties entered into numerous stipulations relating
to distribution of the marital property. The parties stipulated, among
other things, that defendant would advance funds to obtain a
residence and furnishings for plaintiff and the parties' children,
and that defendant would be given a "dollar-for-dollar credit" in
the subsequent equitable distribution for the funds advanced by
him for that purpose. After a five week trial on the claims, the
court took the matter under advisement and then entered judgment
on 5 April 1991. Both parties gave timely notice of appeal from
the judgment entered.

The judgment, which consumes 283 pages of the record on
appeal, shows that the trial court determined that the net value
of the marital property as of the date of separation was $44,183,807;
that an equal division of the marital property was not equitable;
and that an unequal division awarding defendant 69% and plaintiff
31% of the net value of the marital property was equitable. The
court found that the in-kind distribution of the marital property
was largely controlled by the stipulations entered into, and the
preferences expressed, by the parties; and that the preference
of the parties was that all of the marital assets, except the proceeds
in two bank accounts totalling $6,249, be distributed to defendant.
The court divided the marital property in accordance with the

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

parties' stipulations and preferences and granted to plaintiff her share of the marital estate primarily in the form of a distributive award. The court determined that plaintiff was entitled to a distributive award in the amount of $13,696,980, which is 31% of $44,183,807, minus the total of the proceeds in the two bank accounts awarded her. The court further found that defendant was entitled to credits totalling $575,268 for certain postseparation expenditures made by him, including his expenditure of funds to purchase a residence for plaintiff. These deductions reduced the amount of plaintiff's distributive award to $13,115,461.

The court determined that some of the marital assets had appreciated in value since the date of separation while others had depreciated. Subtracting the total depreciation from the total appreciation, the court found the marital estate had appreciated in value since the date of separation in the net amount of $6,546,805. In its conclusions of law, the court stated that postseparation appreciation is neither marital nor separate property, but is to be considered by the trial court as a distributional factor, and that the trial court could grant "an adjustive credit of all or any part of the post-separation appreciation . . . in any ratio which it deems to be equitable." The court found it was equitable to grant plaintiff an adjustive credit equal to 31% of the net postseparation appreciation and therefore gave plaintiff such a credit by adding 31% of $6,546,805, which is $2,029,509, to plaintiff's distributive award. As a result of the distribution ordered by the court, defendant was awarded marital property having a net value as of the date of separation of $30,486,826, which is 69% of $44,183,807, and plaintiff was awarded two bank accounts containing a total of $6,249 plus a distributive award of $15,144,971. The total of the award to plaintiff therefore is $15,151,220, which amount is greater than 31% of the net value of the marital property as of the date of separation.

The court ordered that the distributive award be paid as follows: (1) that defendant make a lump sum payment of $2,144,971 on or before 14 June 1991; and (2) that defendant pay the balance of the award by making 120 equal payments (extending over a period of ten years) of $157,725 per month, with the first payment being due on or before 1 July 1991. The trial court, however, on motion of defendant, granted a stay of its judgment pending the outcome of the present appeals.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

*Robinson, Bradshaw & Hinson, P.A., by Martin L. Brackett, Jr., Mark W. Merritt, and John B. Garver, III, for plaintiff.*

*James, McElroy & Diehl, P.A., by William K. Diehl, Jr., John S. Arrowood, and G. Russell Kornegay, III, for defendant.*

ARNOLD, Chief Judge.

*OVERVIEW*

This case involves a marital estate with a net value as of the date of trial of over fifty-one million dollars. Issues pertaining to classification, valuation, and distribution of property are presented. As is particularly shown by the judgment, the trial court thoroughly sifted through the evidence; addressed in detail each issue presented, many of which are extremely complex; and did a commendable job of the tasks assigned him. Despite the laudable effort of the trial judge, there is error appearing from the judgment which requires that the case be remanded for correction of those errors.

Upon application of a party for an equitable distribution, the trial court "shall determine what is the marital property and shall provide for an equitable distribution of the marital property . . . in accordance with the provisions of [N.C. Gen. Stat. § 50-20 (Cum. Supp. 1992)]." N.C. Gen. Stat. § 50-20 (Cum. Supp. 1992). In so doing, the court must conduct a three-step analysis. *Willis v. Willis,* 86 N.C. App. 546, 358 S.E.2d 711 (1987). First, the court must identify and classify all property as marital or separate based upon the evidence presented regarding the nature of the asset. *Ciobanu v. Ciobanu,* 104 N.C. App. 461, 409 S.E.2d 749 (1991). Second, the court must determine the net value of the marital property as of the date of the parties' separation, with net value being market value, if any, less the amount of any encumbrances. *Beightol v. Beightol,* 90 N.C. App. 58, 367 S.E.2d 347, *disc. review denied,* 323 N.C. 171, 373 S.E.2d 104 (1988); *Willis,* 85 N.C. App. 708, 355 S.E.2d 828 (1987); N.C. Gen. Stat. § 50-21(b) (Cum. Supp. 1992). Third, the court must distribute the marital property in an equitable manner. *Beightol,* 90 N.C. App. 58, 367 S.E.2d 347.

In performing the latter task, the trial court is vested with wide discretion. *White v. White,* 312 N.C. 770, 324 S.E.2d 829 (1985). "[W]here matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there

was a clear abuse of discretion." *White*, 312 N.C. at 777, 324 S.E.2d at 833.

> A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason, or that its ruling could not have been the result of a reasoned decision. . . . Only when the evidence fails to show *any* rational basis for the distribution ordered by the court will its determination be upset on appeal.

*Nix v. Nix*, 80 N.C. App. 110, 112, 341 S.E.2d 116, 118 (1986) (citation omitted). Furthermore, for purposes of appellate review, the trial court's findings of fact are conclusive if supported by any competent evidence in the record. *Nix*, 80 N.C. App. 110, 341 S.E.2d 116.

Finally, we note that many of the figures relied upon by the court were rounded off, a fact which should be kept in mind in checking the mathematical accuracy of the calculations referred to herein. We now turn to the issues presented.

## CLASSIFICATION

### A. Sonic

The key asset in dispute in this case is defendant's interest in Sonic Financial Corporation ("Sonic"), a North Carolina corporation that serves as a holding company for a variety of defendant's business interests. On the date of the parties' separation, defendant owned 90.4% of the stock of Sonic. The court found that the net value of defendant's interest in Sonic as of the date of separation was $35,515,000. It appears that the court found defendant's interest in Sonic was of a dual nature, having both a marital property component and a separate property component. The court found the asset to be primarily marital in that it found the separate property component had a net value as of the date of separation of only $1,196,862, leaving a marital property component with a net value as of that date of $34,318,000.

Sonic, as a North Carolina corporation and holding company, did not come into existence until December 1987. Sonic was the product, however, of a long series of mergers, name changes, and acquisitions involving various business entities in which defendant had an interest, which for the most part occurred during the parties' marriage. The trial court approached the classification of Sonic by first identifying the assets in which defendant had an interest

as of the date of marriage, which after the date of marriage were contributed by defendant towards the eventual creation of Sonic. In so doing, the court traced the history of much of defendant's business dealings during the marriage and the history of the events leading to the creation of Sonic. Despite the fact Sonic did not exist on the date of marriage, the court, in effect, classified Sonic by treating it as defendant's separate property that had appreciated in value during the marriage. The court determined that all of the appreciation in value of Sonic during the marriage had been active, and therefore was marital property.

The court found that the assets owned by defendant prior to the marriage which were utilized in the eventual creation of Sonic, comprised the separate property component of Sonic, and had a total net value as of the date of marriage of $1,196,862. Consistent with its finding that all of the appreciation in Sonic during the marriage had been active, the court found that there had been no passive appreciation during the marriage in the separate property component of Sonic. The court further found that $1,196,862 was the date of separation net value of Sonic, and that this was defendant's separate property which was to be returned to him.

Two arguments are made by defendant that the court erred in classifying Sonic: (1) by failing to provide him with a fair and proportionate return on his investment of separate property in the marital estate; and (2) by "classifying [his] separate property as marital." In the latter argument he contends the court's finding that all of the appreciation of Sonic during the marriage was active is unsupported by the record. We uphold the court's classification of Sonic, but we use a different analysis from that utilized by the trial court.

The trial court's first task in an action for equitable distribution is to classify all property owned by the parties as marital or separate in accordance with the definitions set forth in N.C. Gen. Stat. § 50-20(b) (Cum. Supp. 1992). *See* N.C. Gen. Stat. § 50-20(a) (Cum. Supp. 1992); *McLean v. McLean*, 323 N.C. 543, 374 S.E.2d 376 (1988). N.C. Gen. Stat. § 50-20(b)(1), in pertinent part, defines marital property as "all . . . property acquired by either spouse or both spouses during the course of the marriage and before the date of the separation of the parties, and presently

owned, except property determined to be separate property
. . . ." Separate property is defined by the statute as including
the following:

> all . . . property acquired by a spouse before marriage or
> acquired by a spouse by bequest, devise, descent, or gift during
> the course of the marriage. . . . Property acquired in exchange
> for separate property shall remain separate property regardless
> of whether the title is in the name of the husband or wife
> or both and shall not be considered to be marital property
> unless a contrary intention is expressly stated in the conveyance.
> The increase in value of separate property and the income
> derived from separate property shall be considered separate
> property.

N.C. Gen. Stat. § 50-20(b)(2).

The key term in both definitions is "acquired." In *Wade v.
Wade*, 72 N.C. App. 372, 325 S.E.2d 260, *disc. review denied*, 313
N.C. 612, 330 S.E.2d 616 (1985), this Court adopted a dynamic rather
than a static interpretation of the term "acquired" as used in G.S.
§ 50-20(b), stating "that acquisition must be recognized as the ongo-
ing process of making payment for property or contributing to
the marital estate rather than being fixed on the date that legal
title to property is obtained." *Wade*, 72 N.C. App. at 380, 325
S.E.2d at 268-69. This Court further recognized that since acquisi-
tion is an ongoing process, property may have a dual nature and
consist of both marital property and separate property components.
*Wade*, 72 N.C. App. 372, 325 S.E.2d 260.

By recognizing that acquisition is an ongoing process and that
property may have a dual nature, this Court adopted what is known
as the "source of funds" approach. *Id.; Willis*, 86 N.C. App. 546,
358 S.E.2d 711. *See also* Lawrence J. Golden, *Equitable Distribu-
tion of Property* (1983) (Cum. Supp. 1993 by B. Turner at § 5.07)
(hereinafter "Turner") (The source of funds rule is a combination
of a payment-based definition of acquired, and the recognition that
property may be of a dual, or mixed, nature.). The Court explained
the source of funds approach as follows:

> Under this [approach], when both the marital and separate
> estates contribute assets towards the acquisition of property,
> each estate is entitled to an interest in the property in the
> ratio its contribution bears to the total investment in the prop-

erty. . . . Thus, both the separate and marital estates receive a proportionate and fair return on its investment.

*Wade*, 72 N.C. App. at 382, 325 S.E.2d at 269 (citation omitted).

In *Wade*, this Court also distinguished between active and passive appreciation of separate property occurring during marriage and before separation. The Court interpreted that part of G.S. § 50-20(b)(2), which classifies the increase in value of separate property as separate property, as referring only to increases due to passive appreciation, such as that due to inflation or other market forces. Increases due to active appreciation, on the other hand, should be classified as marital property. *Wade*, 72 N.C. App. 372, 325 S.E.2d 260. Appreciation is considered active when it results from contributions, monetary or otherwise, made by one or both of the spouses. *Id. See also* Turner, *supra* § 5.39 at 153 ("*Active appreciation* is appreciation caused by marital funds or marital efforts . . . .").

This passive versus active distinction for classifying increases in the value of separate property occurring during marriage and prior to separation is a refinement of the source of funds approach and is designed to ensure that marital contributions to the appreciation of separate property are credited to the marital estate. Sally B. Sharp, *The Partnership Ideal: The Development of Equitable Distribution in North Carolina*, 65 N.C.L. Rev. 195, 214 (1987). There has been some confusion, however, in this State and in other source of funds states over the relationship between the source of funds rule and the active/passive appreciation rule. *See* Sharp, *supra* at 213-20; Turner, *supra* § 5.07A at 86. One authority has attempted to clarify the relationship between these two rules as follows:

[T]he active/passive rule is used only for classifying appreciation in separate property. All active/passive jurisdictions agree that appreciation in marital property remains marital, regardless of cause. Thus, before applying the active/passive rule, one must first determine whether the underlying property is separate or marital. To the extent the property was acquired during the marriage, its entire appreciated value is marital . . . . If, after applying the source of funds rule, there is any separate interest in the underlying property, then any

**SMITH v. SMITH**

[111 N.C. App. 460 (1993)]

appreciation in that separate portion must be classified under the active/passive rule.

Turner, *supra* § 5.07A at 86.

Our decision in *Wade* has been criticized as contributing to this confusion by' failing to make clear the relationship between these aspects of the source of funds approach. *See* Sharp, *supra* at 212-20. In particular, criticism has been leveled at this Court for focusing in *Wade* on the issue of how to treat the increase in value of a party's separate property occurring during marriage, rather than on the more fundamental issue of whether the property should have been regarded as separate in the first instance. *Id.* In this regard, it has been said that this Court overlooked the importance of the distinction between characterization of an asset as an increase in value of separate property, and characterization of an asset as marital property to which a contribution of a party's separate estate was made. *Id.* This criticism is well taken and is particularly relevant to the present case.

[1] If an asset is characterized as separate property that has increased in value during the marriage, the court's focus is on the appreciation occurring during the marriage and whether that appreciation was passive or active. If, on the other hand, an asset is characterized as marital property to which a contribution of separate property was made, in which case it is of a dual nature having a marital and a separate property component, then the primary focus is on *acquisition*, not appreciation. It logically follows from the definitions set forth at G.S. § 50-20(b) and *Wade* that the appropriate characterization and classification of an asset depends upon when and how the asset was acquired. *See* G.S. § 50-20(b)(1) and (2); *Wade*, 72 N.C. App. 372, 325 S.E.2d 260.

[2] Because the trial court characterized Sonic as defendant's separate property that appreciated in value during the marriage, it had to utilize the active/passive distinction to determine whether the appreciation was marital or separate in nature. A fundamental flaw with this characterization is that Sonic did not even come into existence until after the parties had been married fifteen years. To characterize Sonic as property owned by defendant prior to the marriage when, in fact, it did not even exist at that time, clearly seems inappropriate. It appears the court characterized Sonic in this manner because defendant owned at the date of marriage certain business interests that were utilized in, and contributed

towards, the creation of Sonic during the marriage. The property owned by defendant prior to the marriage, however, was not Sonic and was only a small part of what eventually became Sonic, as is shown by the findings of fact made by the court.

The findings made by the court regarding the history of defendant's business dealings leading up to the creation of Sonic are summarized as follows: One year before the parties married, defendant and two associates formed a Texas corporation known as Pioneer Ford, Inc. ("Pioneer Ford"). Defendant purchased 90% of the capitalizing stock of Pioneer for a total of $1,800. On the date of the parties' marriage, and in the year preceding the marriage, Pioneer Ford had no employees, no income other than the $2,000 generated from the initial stock purchase, no expenses, and operated no business that was in actual operation. We note that defendant contended at trial that Pioneer Ford was an operating automobile dealership on the date of marriage. The trial court expressly rejected that contention, however, finding no credible evidence to support it.

On the date of marriage, defendant also owned a minority interest of Charlotte Motor Speedway ("CMS") stock, consisting of 29,750 out of the 1,884,723 shares issued; 80% of the shares of stock of Sharpstown Dodge, Inc., an automobile dealership; 100% interest in another automobile dealership known as Marietta Dodge d/b/a Cars of the Continent; 90% of the shares of stock of yet another automobile dealership, Frontier Ford, Inc.; and a 50% partnership interest in Viking Investment Associates. All of the property just mentioned was contributed or utilized in some fashion after the date of marriage towards the creation of Sonic, and was identified by the trial court as the separate property component of Sonic, and found to have a total net value as of the date of marriage of $1,196,862.

*After the date of marriage,* the following occurred: Pioneer Ford was renamed Lone Star Ford, Inc. ("Lone Star"), and defendant purchased additional shares of Lone Star. Defendant further increased his ownership percentage in Lone Star by exchanging all or part of his shares of stock in CMS, Sharpstown Dodge, Frontier Ford, and Marietta Dodge for shares in Lone Star. In the spring of 1986 and again in December 1987, a number of the corporate entities in which defendant had an interest were reorganized. As part of the 1986 reorganization, Lone Star merged with

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

and assumed the name of one of its wholly owned subsidiaries, a Texas corporation known as Sonic Financial Corporation. As a result of the December 1987 reorganization, Sonic Financial Corporation merged with CSF Corporation, a North Carolina corporation, which immediately changed its name to Sonic Financial Corporation, a North Carolina corporation. As part of the December 1987 reorganization, Sharpstown Dodge, Frontier Ford, and three other corporations — Viking Financial, Inc., American General Advertising Corporation, and Marcus David Leasing Company — each merged into Sonic. From these findings, the trial court found that the "pre-marriage entity of Pioneer Ford, Inc., became, through this series of mergers and name changes, Sonic Financial Corporation," the holding company now in dispute.

After December 1987, Sonic continued to grow and evolve. *As of the date of separation*, the following were *wholly owned* subsidiaries of Sonic: (1) Charlotte Motor Speedway, Inc., and its subsidiary, the Speedway Club, Inc., ("CMS"); (2) Provident American Insurance Co., an insurance company licensed and headquartered in Texas; (3) Town and Country Ford, Inc. ("Town and Country"), an automobile dealership in Charlotte; and (4) Lone Star Ford, Inc., an automobile dealership in Texas that is *not* the same entity as the Lone Star mentioned previously herein. In addition to these wholly owned subsidiaries, Sonic also consisted of the following on the date of the parties' separation: (a) Chartown, a North Carolina partnership holding real estate assets, which is wholly owned by one of Sonic's wholly owned subsidiaries; (b) STC, another North Carolina partnership consisting of real estate assets, which is owned by Sonic and one of its subsidiaries; (c) Smith-Egan Interiors Division, a dormant operation with a net value of zero; (d) a 9.1% ownership interest in Viking Investment Associates, a Texas partnership that owns the land and facility used by Lone Star Ford, Inc.; and (e) a Service Contracts Division, which is used by Town and Country Ford with respect to warranty contracts involved in its automobile sales.

It appears the court's characterization of Sonic as defendant's separate property that increased in value during the marriage is based on its finding that the pre-marriage entity, Pioneer Ford, "became" Sonic. We do not believe that the fact there was a corporate entity existing on the date of marriage, Pioneer Ford, that was later utilized and contributed along with numerous other entities and assets, after the date of the parties' marriage, towards

creation of Sonic requires that the totality of defendant's interest in Sonic be viewed as separate property that simply increased in value during the marriage. Although Sonic is a successor in interest of sorts of Pioneer Ford, it is not the same entity that existed as Pioneer Ford on the date of the marriage. Pioneer Ford, as it existed on the date of marriage, having no employees, virtually no income, no expenses, and no business in operation, bears no resemblance to Sonic, the holding company existing on the date of the parties' separation. Sonic is not simply Pioneer Ford under a different name; it is a separate entity unto itself, which we conclude was acquired during the marriage.

We believe the trial court should have approached the classification of Sonic differently by focusing on when and how defendant's interest in Sonic was acquired. It is difficult to say, under the complex set of facts presented here, exactly when defendant's interest in Sonic was acquired. We do not believe, however, that it is appropriate to characterize defendant's interest in the holding company existing on the date of separation as having been acquired before the marriage when no entity even remotely resembling that holding company existed on the date of marriage. If defendant's interest was not acquired *before* the marriage, it follows that it must have been acquired *during* the marriage, and thus falls within the definition of marital property.

[3] We have sufficiently established *when* Sonic, and therefore defendant's interest in Sonic, was acquired, and must now determine *how* it was acquired—that is, the source of assets with which it was acquired. It is clear from the evidence and the findings made that defendant owned assets prior to the marriage that were contributed *during* the marriage towards *acquisition* of defendant's interest in Sonic. Those assets were properly identified by the court as the separate property component of Sonic. The remaining component of defendant's interest would appear to be marital since it was acquired during the marriage, except to the extent it represents passive appreciation of the separate property component. *See* Turner, *supra* § 5.07A at 86; *McLeod v. McLeod*, 74 N.C. App. 144, 327 S.E.2d 910, *cert. denied*, 314 N.C. 331, 333 S.E.2d 488 (1985), *overruled on other grounds, Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430 (1987). From this, we conclude the trial court correctly recognized that defendant's interest in Sonic was of a dual nature, having both a marital property and a separate property component. More precise identification of the separate

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

property and marital property components of this asset, however, requires application of the source of funds approach and consideration of the applicable burdens of proof.

Under the source of funds approach, where both the marital estate and the separate estate contribute towards acquisition of an asset, each estate is entitled to an interest in the asset acquired and entitled to a fair return on its investment. *Wade*, 72 N.C. App. 372, 325 S.E.2d 260. The source of funds approach dictates that a party retain as separate property the amount the party contributed towards acquisition of an asset plus the increase on that investment due to passive appreciation. *McLeod*, 74 N.C. App. 144, 327 S.E.2d 910; Turner, *supra*, § 5.07A at 82 ("The heart of the source of funds rule is in its recognition that the marital and separate estates are entitled not only to the amount of their contributions, but also to any passive appreciation in those contributions."). Increases on that investment of separate property due to active appreciation, however, and contributions made by the marital estate plus the increases on the marital contributions (whether because of passive or active appreciation) are marital property. *McLeod*, 74 N.C. App. 144, 327 S.E.2d 910. *See also* Turner, *supra*, § 5.07A at 86.

Determination of the relative size of the interests of the marital and separate estates, including the return on investment to which each estate is entitled, requires consideration of the burdens of proof placed on the parties. Classification of property as marital or separate depends upon the proof presented to the trial court regarding the nature of the asset. *Atkins v. Atkins*, 102 N.C. App. 199, 401 S.E.2d 784 (1991).

> The burden of showing the property to be marital is on the party seeking to classify the asset as marital and the burden of showing the property to be separate is on the party seeking to classify the asset as separate. . . . A party may satisfy her burden by a preponderance of the evidence. . . .
>
> The party claiming the property to be marital must meet her burden by showing by the preponderance of the evidence that the property: (1) was "acquired by either spouse or both spouses"; and (2) was acquired "during the course of the marriage"; and (3) was acquired "before the date of the separation of the parties"; and (4) is "presently owned." N.C.G.S. § 50-20(b)(1).

*Atkins*, 102 N.C. App. at 206, 401 S.E.2d at 787 (citations omitted). The party claiming the property is separate meets his burden by showing by the preponderance of the evidence that the property falls within the definition of separate property set forth in N.C. Gen. Stat. § 50-20(b)(2). *Id.; see also Ciobanu v. Ciobanu*, 104 N.C. App. 461, 409 S.E.2d 749 (1991). "If both parties meet their burdens, then under the statutory scheme of N.C.G.S. § 50-20(b)(1) and (b)(2), the property is excepted from the definition of marital property and is, therefore, separate property." *Atkins*, 102 N.C. App. at 206, 401 S.E.2d at 788.

Plaintiff here met her burden of showing that defendant's interest in Sonic was acquired by defendant during the marriage and before the date of separation, and was presently owned, and therefore falls within the definition of marital property. Defendant then had the burden of showing that this asset, or any part of it, is separate in nature. Defendant did show, by a preponderance of the evidence, that part of his interest in Sonic was acquired through the use of, or in exchange for, a contribution of his separate property, valued at the date of marriage at $1,196,862. By so doing, defendant met his burden of showing there is a separate property component to his interest in Sonic, at least in the amount of that contribution.

Defendant failed to show, however, what amount, if any, of the increase in the value of that investment of his separate property occurring during the marriage was attributable to passive appreciation. Indeed, counsel for defendant conceded in oral argument before this Court that defendant did not meet his burden of showing what proportion of the increase in value of Sonic during the marriage was due to passive appreciation. Since defendant showed only that he made a contribution of assets from his separate estate valued at $1,196,862, and did not show any return on that investment of his separate property attributable to passive appreciation, the trial court correctly determined that the separate property component of defendant's interest in Sonic had a value of only $1,196,862. While ordinarily under the source of funds approach, a mere return of the base amount of one's contribution of separate property is not a fair return on the investment made, such return is the appropriate one here given the evidence presented. *See* Turner, *supra* § 5.07A; Sharp, *supra*, at 215 n.113.

Additionally, there is ample competent evidence in the record to support the trial court's finding that all of the increase in value

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

of defendant's separate property (contributed towards acquisition of Sonic) occurring during the marriage was due to active appreciation, and therefore was marital property. The court made extensive findings of fact in support of its determination that all of the increase in value of the assets in question was attributable to active appreciation. In its findings, the court addressed in considerable detail defendant's management, acquisition, utilization, and control of the assets both brought into and acquired during the marriage, as well as defendant's assistance in the acquisition of business opportunities, loans to the businesses, and waivers of salary. The findings made are sufficient to support the court's determination that all of the appreciation in the value of Sonic, and the assets contributed towards Sonic, occurring during the marriage was active, and those findings are amply supported by the evidence presented.

In sum, we find no reversible error in the trial court's classification of Sonic, and reject defendant's arguments pertaining to classification of that asset. The trial court properly recognized that defendant's interest in Sonic was of a dual nature, properly identified the marital and separate property components of that asset, and properly determined that the appreciation in the separate property contributed by defendant towards acquisition of Sonic was wholly active, and therefore marital property.

### B. Stock Redemption

[4] Defendant next contends the court erred by classifying cash proceeds received by him after the date of separation from First Westwood National Corporation ("First Westwood") as marital property. The court found that during the marriage the parties acquired 800 shares of stock in First Westwood. In September 1986, this stock was redeemed by the issuing corporation. In October 1986, defendant received a check for $499,895.25 marked "Redemption" along with a letter stating, in pertinent part:

Enclosed please find the settlement checks in connection with the redemption of your First Westwood National Stock. It is my understanding that you are still writing with us at the present time and any business written by your two Dealerships after June 30, 1986 will automatically be credited to your ongoing (runoff) account. In other words, your account is still growing as you continue to produce business.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

In July 1989, over one year after the date of separation, defendant received an additional payment of $300,000 from First Westwood in the form of a check marked "Final Redemption of Stock". The court found that no other First Westwood stock owned by defendant was redeemed between September 1986 and July 1989, that there was no credible evidence that the July 1989 redemption payment arose from any activity occurring after the date of separation, and that defendant declared the $300,000 in his 1989 U.S. Individual Income Tax Return as a long term capital gain received by him from the sale of stocks, bonds, and other securities. Based on these findings, the court found that although part of the payment for the redemption of the stock was made after the date of separation, the proceeds received in July 1989 were nevertheless marital property because they were from the sale of stock acquired during the marriage, and sold prior to the date of separation, and were received in exchange for marital property. Since neither party presented evidence that the cash proceeds received in July 1989 had a value different than that on the date of their receipt, the court found the proceeds had a net value as of the date of separation of $300,000.

Defendant contends the court erred both in its classification and valuation of the proceeds received in July 1989. Relying on *Becker v. Becker*, 88 N.C. App. 606, 364 S.E.2d 175 (1988), defendant contends that since the proceeds were received after the date of separation, they are neither marital, nor separate property, and may not be included in the marital estate. In *Becker*, this Court held that the trial court erred by classifying as marital property the rental value of the marital residence for the period after the date of separation and before distribution. In so holding, this Court noted that for purposes of classification, the marital estate is frozen as of the date of separation, and thus no new property may be added to the marital estate after that date. *Id.* In other decisions as well, this Court has reaffirmed the proposition that the marital estate is limited to property that is owned by the parties on the date of separation and may not be augmented by property acquired after that date. *See Chandler v. Chandler*, 108 N.C. App. 66, 422 S.E.2d 587 (1992); *Truesdale v. Truesdale*, 89 N.C. App. 445, 366 S.E.2d 512 (1988).

Certain exceptions to this general rule, however, have been recognized. For example, this Court has recognized that when there has been an exchange or conversion of marital assets after the

date of separation, the new property acquired as a result of the exchange or conversion may properly be classified as marital property. *See, e.g., Mauser v. Mauser,* 75 N.C. App. 115, 330 S.E.2d 63 (1985); *Phillips v. Phillips,* 73 N.C. App. 68, 326 S.E.2d 57 (1985). Additionally, our appellate courts have recognized that funds received after the date of separation may appropriately be classified as marital property under certain circumstances when the right to receive those funds is acquired during the marriage and before separation. *See Johnson v. Johnson,* 317 N.C. 437, 346 S.E.2d 430 (1986) (Settlement received after the date of separation upon a spouse's claim for personal injuries sustained during the marriage is marital property to the extent it represents compensation for economic loss.); *Freeman v. Freeman,* 107 N.C. App. 644, 421 S.E.2d 623 (1992) (Where a spouse is injured during marriage and before separation but does not receive a workers' compensation award until after the date of separation, the award is nevertheless marital property to the extent it represents compensation for economic loss prior to the separation.); *Talent v. Talent,* 76 N.C. App. 545, 334 S.E.2d 256 (1985) (Where a loan was made during the marriage from marital funds and collected by one of the spouses after the date of separation, the funds collected should be considered marital property.).

In *Johnson,* our Supreme Court expressly refused to hold that the personal injury settlement received by the husband had to be classified as his separate property because it was received after the date of separation, explaining as follows:

> To summarily classify the $95,000 as separate property of the plaintiff-husband merely because a check in that amount was received by him after separation of the parties would ignore the classification scheme of our Equitable Distribution Act. In order to classify the $95,000 for equitable distribution purposes, the trial court was required to determine the nature of the asset. Was it a gift? An inheritance? Earnings of a spouse? Proceeds from the sale of marital property? . . . Only after determining the nature of the asset received by one spouse *after separation,* yet claimed by the other to be "marital property," may a classification be made of that asset as between "marital" or "separate" property.

*Johnson,* 317 N.C. at 452, 346 S.E.2d at 438-39. Additionally, the Court quoted with approval the following: "The literal language

of the statute ought not limit our inquiry to the time when the compensation is received. The purpose for which the property is received should control." *Johnson*, 317 N.C. at 451, 346 S.E.2d at 438 (quoting *Amato v. Amato*, 180 N.J. Super. 210, 434 A.2d 639 (App. Div. 1981)).

The trial court here correctly applied these principles in that it classified the asset in question by looking at the nature of the asset and the purpose for which it was received. The court determined that the check received in July 1989 represented part of the proceeds from the sale of the First Westwood stock to the issuing corporation. The stock that was sold appeared to be marital in nature because it was acquired during the marriage, and defendant does not argue otherwise, and was sold prior to the date of separation. Since the check received after separation represented proceeds from the sale of a marital asset occurring prior to the parties' separation, the court classified the proceeds as marital property. This classification is consistent with the law of this State and is supported by the evidence presented and the findings made. We therefore find no error in the classification of the proceeds received in July 1989 as marital property.

We further find no error in the court's valuation of this asset. There is competent evidence in the record that supports the value placed on this asset by the trial court; therefore, we shall not disturb that valuation. *See Nix*, 80 N.C. App. 110, 341 S.E.2d 116.

### C. Dividend Income

[5]  Plaintiff presents one argument pertaining to classification. She contends the trial court erred by failing to include in the marital estate $240,162 in dividend income received by defendant after the date of separation and prior to trial. The court found that the parties owned on the date of separation shares of preferred and common stock, and stock warrants in the N.C. Federal Savings and Loan Association, that had been acquired during the marriage, and that this property was marital property. The court further found that defendant received dividend income of $240,162 from this stock between the dates of separation and trial. The court did not, however, include the dividend income in the marital estate, and did not expressly consider defendant's receipt of this income as a distributional factor under G.S. § 50-20(c) in determining an equitable distribution of the marital property. Plaintiff contends the court should have either treated this income as postseparation

appreciation of marital property and considered it as a distributional factor under G.S. § 50-20(c)(11a) or (12), or treated the income as marital property that was converted by defendant. Plaintiff contends that in either case the court should have distributed the income between the parties in the same proportion as the marital property.

Although we have not previously considered the classification or treatment of dividend income received after the date of separation, we have considered the classification and appropriate treatment of income from another source received by one party after the date of separation. In *Chandler v. Chandler*, 108 N.C. App. 66, 422 S.E.2d 587 (1992), this Court held that rental income from marital property received after the date of separation, and before the date of trial, may not be added to the marital estate and distributed as marital property, but instead must be considered by the court as a distributional factor. The Court explained that "[r]ather than distributing the . . . income received from marital property, the trial court must consider the existence of this income, determine to whose benefit the income has accrued, and then consider that benefit when determining whether an equal or unequal distribution of the marital estate would be equitable." *Id.* at 69, 422 S.E.2d at 590.

We find no basis on which to distinguish the dividend income received here from the rental income received in *Chandler*, and therefore find *Chandler* controlling on this issue. Additionally, plaintiff has shown no reason why the dividend income here should fall outside the general rule stated in *Becker* limiting the marital estate to property owned on the date of separation. *See Becker*, 88 N.C. App. 606, 364 S.E.2d 175. The record does not show that the dividend income was the result of an exchange or conversion of marital assets after the date of separation, and does not show other circumstances regarding the nature of the asset requiring classification of the property as marital. *See Johnson*, 317 N.C. 437, 346 S.E.2d 430; *Truesdale*, 89 N.C. App. 445, 366 S.E.2d 512. We therefore conclude the court properly refused to include the dividend income in the marital estate. The court erred, however, by not considering defendant's receipt of this income as a factor in determining an equitable distribution. *Chandler*, 108 N.C. App. 66, 422 S.E.2d 587. As is further explained herein, we have determined that this cause must be remanded for redetermination of what constitutes an equitable distribution of the marital property

and entry of a new judgment. On remand, the trial court shall expressly consider defendant's receipt of the dividend income in determining the appropriate division of the marital property.

## VALUATION

After classifying the property owned by the parties as either marital or separate, the trial court's next task is to determine the net value of the marital property as of the date of separation. *Ciobanu*, 104 N.C. App. 461, 409 S.E.2d 749. Defendant presents several arguments pertaining to the court's valuation of the marital property here, most of which pertain to valuation of Sonic and its component businesses. After carefully reviewing those arguments, we find no error in the court's valuation of the marital property.

### A. Sonic

Defendant argues the court erred in its valuation of Sonic in that it allegedly erred in valuing several of Sonic's component businesses. Because Sonic is a holding company, its value necessarily depends upon the value of its components. Under the methodology utilized by the court in valuing this asset, an error in valuing one of the component businesses of Sonic would necessarily taint the value placed on Sonic itself.

In reviewing the trial court's valuation of an ongoing business or an interest therein for purposes of equitable distribution, the task of the appellate court is to determine whether the approach used by the trial court reasonably approximates the net value of the business interest. *Fox v. Fox*, 103 N.C. App. 13, 404 S.E.2d 354 (1991); *Draughon v. Draughon*, 82 N.C. App. 738, 347 S.E.2d 871 (1986), *cert. denied*, 319 N.C. 103, 353 S.E.2d 107 (1987). If it does, the valuation will not be disturbed. *Fox*, 103 N.C. App. 13, 404 S.E.2d 354. In *Poore v. Poore*, 75 N.C. App. 414, 422, 331 S.E.2d 266, 272, *disc. review denied*, 314 N.C. 543, 335 S.E.2d 316 (1985), we stated that:

> In ordering a distribution of marital property, a court should make specific findings regarding the value of a spouse's professional practice and the existence and value of its goodwill, and should clearly indicate the evidence on which its valuations are based, preferably noting the valuation method or methods on which it relied. On appeal, if it appears that the trial court reasonably approximated the net value of the practice and its goodwill, if any, based on competent evidence

and on a sound valuation method or methods, the valuation will not be disturbed.

Although we were addressing the valuation of a professional practice in *Poore*, the requirements and standard of review set forth therein apply to valuation of other business entities as well. *Fox*, 103 N.C. App. 13, 404 S.E.2d 354 (valuation of an interest in an accounting partnership); *Locklear v. Locklear*, 92 N.C. App. 299, 374 S.E.2d 406 (1988), *disc. review allowed*, 324 N.C. 336, 378 S.E.2d 794 (1989) (valuation of closely-held corporation); *Draughon*, 82 N.C. App. 738, 347 S.E.2d 871 (valuation of sole proprietorship). With this in mind, we now review the valuations contested by defendant.

### 1. *Charlotte Motor Speedway, Inc.*

[6] Defendant first argues the court erred in its valuation of Charlotte Motor Speedway, Inc. ("CMS"), which is a wholly owned subsidiary of Sonic and by far its most valuable asset. He contends the court erred in its valuation of CMS in that: (1) the court failed to use a sound valuation methodology; and (2) the evidence does not support the findings made or the method, or methods, used by the court in valuing this asset.

In its judgment, the court stated that in valuing CMS it primarily relied on the testimony of defendant; Bill Brooks, defendant's accountant; J. Ray Nicholson, plaintiff's valuation expert; and Robert O. Beck, defendant's valuation expert; and placed the most reliance on the opinions of Nicholson and Beck. In valuing CMS, Nicholson used an income approach as his primary methodology, and used a market multiple approach as a secondary methodology to test the reasonableness of the values obtained by his primary approach. Beck used the excess earnings approach and did not utilize any alternative approaches as a comparison or check on the values obtained by that methodology.

The court rejected as inaccurate the market multiple approach used by Nicholson as his secondary methodology, but found both the income approach and the excess earnings approach to be reasonable and accurate methodologies for use in valuing CMS. The court found "the methodologies and valuations of each expert are conservative, and even these approaches could have used defensible discretionary factors, such as multiples, for which there was evidentiary support and which would have produced higher indications of value than those given." The court, however, found defects

in Nicholson's valuation of CMS based on Nicholson's lack of familiarity with and knowledge of the type of asset being valued, and based on his application of his primary methodology to this asset. The court also found defects in Beck's valuation of CMS with respect to: (1) the degree of risk claimed by defendant and Beck to be inherent in an investment in an asset such as CMS; (2) Beck's lack of care in key data and mathematical computations; (3) the computation of CMS's weighted average income, which is a key component in determining excess earnings; and (4) the capitalization rate chosen by Beck.

The court chose to determine the value of CMS by use of the excess earnings approach, because it found that approach had a structural flexibility that permitted the court to correct the defects contained in Beck's valuation, and thereby obtain an accurate valuation. Defendant contends the court correctly sought to value CMS under the excess earnings approach, but erred by the adjustments made to Beck's valuation, and that the adjustments made affect the validity, or soundness, of the values ultimately obtained. Specifically, defendant argues the court erred: (1) in its calculation of the weighted average of pre-tax income used in determining excess earnings; and (2) in selecting a capitalization rate defendant claims is unsupported by the evidence.

Determination of the merits of these arguments requires an examination of the excess earnings methodology. Under the excess earnings approach used herein, the net value of CMS was determined by adding the following three components: (1) the net value of its facilities; (2) the capitalized excess earnings currently realized by its operational activities; and (3) its book value, excluding the appraised value of its facilities. The court accepted the values given by Beck for the first and third components of this asset but did not accept as accurate Beck's calculation of the capitalized excess earnings.

This methodology defines excess earnings as the net income from operations in excess of a normal return on value from a net lease of the real property owned by CMS, or, stated differently, the amount by which expected net income from operations would exceed the expected rental income. To determine the value of CMS's capitalized excess earnings, Beck first reviewed the three twelve-month periods preceding each valuation date to estimate the projected level of income for CMS as of those dates. The projected

levels of income were reduced to net income figures by subtracting the total of operating expenses. Beck converted those net figures into a weighted average income for each valuation date, arriving at the weighted average of pre-tax income. From those averages, Beck subtracted the gross rental income that a reasonable investor would expect from his investment. The resulting figures constituted the excess earnings over rental value as of each valuation date. From those figures, Beck subtracted the estimated income tax applicable to the excess earnings. Lastly, a capitalization rate was applied to arrive at the amount of the capitalized excess earnings, which amount represents the value of the operating earnings as of each valuation date.

When Beck calculated the weighted average of pre-tax income for CMS, he included amounts for depreciation and interest within the operating expenses subtracted from the projected levels of income. The trial court found that "[t]his substantially reduced the pre-tax income for each year involved and substantially depressed the weighted average obtained therefrom." The court further found that "[a]n investor would not be experiencing depreciation or interest in computing the expected return on investment, and depreciation is not an actual dollar expenditure; similarly, Mr. Beck conceded that interest should not have been deducted from total net revenues to reach pre-tax income." The court found the depreciation and interest had been improperly included within the operating expenses deducted and therefore utilized in its valuation of CMS a recomputed weighted average pre-tax income that did not include deductions for depreciation and interest.

Defendant contends this was error. He argues that failing to permit deduction for depreciation and interest in computing the weighted average pre-tax income results in a valuation based on capitalized excess cash flow, rather than capitalized excess earnings, and that there was no evidence showing that use of capitalized excess cash flow is a sound valuation method. We reject defendant's contention.

The record shows that on cross-examination, Beck conceded that because depreciation and interest had been taken into consideration in setting the amount of expected rental income, those items should not have also been included within the operating expenses deducted. In later testimony, Beck attempted to retract his concession, and stated that if depreciation and interest were

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

not included within the operating expenses, then the resulting figure was weighted average cash flow, not weighted average income. The court made note of this conflict in the evidence in its findings of fact, and expressly rejected Beck's attempted retraction. Findings of fact made by the trial court resolving conflicts in the evidence are binding on appellate courts. *In Re Estate Of Trogdon*, 330 N.C. 143, 409 S.E.2d 897 (1991). The court heard extensive testimony from Beck as he attempted to retract his concession on this point. The court nevertheless rejected that testimony and resolved the conflict in the evidence in plaintiff's favor. The findings made by the court regarding this conflict in the evidence and the need to recompute the weighted average pre-tax income without including deductions for depreciation and interest are supported by competent evidence in the record and therefore are binding on appeal. *Id.; Nix*, 80 N.C. App. 110, 341 S.E.2d 116. Accordingly, we reject defendant's argument pertaining to the court's calculation of the weighted average of the pre-tax income.

Defendant next argues the court erred by applying a capitalization rate of 16% in calculating the capitalized excess earnings of CMS. He contends the evidence and the findings made are insufficient to support the court's selection of this particular rate. Again, we find defendant's argument unpersuasive.

A critical element of the excess earnings methodology is the capitalization rate used. Under this methodology, a capitalization rate is applied to the excess earnings of the business so as to take into consideration the degree of risk associated with an investment in the business. Barth H. Goldberg, *Valuation of Divorce Assets* § 6.6 (1984); 2 John P. McCahey, *Valuation and Distribution of Marital Property* § 22.08[2] (1993). "[T]he risk involved refers to the degree of uncertainty that there will be any return on the investment. The greater the uncertainty as to a return, the higher the risk." McCahey, *supra* § 22.08[2] at 22-104. "[I]t is generally true that the higher the risk of creating future earnings, the higher will be the annual rate of return which an investor will seek, and hence, the higher the capitalization rate." Goldberg, *supra* § 6.6 at 146. Thus, the capitalization rate represents the rate of return a prudent investor would expect annually on his investment given current interest rates and the relative risk involved in the type of business in question. McCahey, *supra* § 22.08[2] at 22-103. Determination of the proper percentage of rate to use in the capitalization of earnings of a particular business is somewhat

speculative. Goldberg, *supra* § 6.6. In fact, criticism of the excess earnings methodology has been based on the difficulty in selection of an appropriate capitalization rate. *Id.*

Defendant's valuation expert, Robert O. Beck, selected a capitalization rate of 33%. With respect to the rate selected by Beck, the court found:

359. That while the Court has never seen an expert select such a high capitalization rate, that in itself would not discredit the rate selected; for the reasons stated below, the Court finds that this rate is far too high and inaccurately depressed indicated value.

360. Mr. Beck gave only one reason for his selection of a 33% rate, this being the "volatility of earnings" of the corporation. That an examination of the corporate earnings reveals no such volatility. Whether one includes depreciation and net interest or excludes them, in the years he considered, beginning with the corporate fiscal year 1984, and continuing thereafter, all the key earnings components show a consistent and upward trend, with no year indicating a loss. This is true of race event revenues, gross profit from racing, club restaurant revenues, total net revenues, total income from operations and pre-tax income. That, except for a moderate reduction in some of these components between the 12/31/87 and 12/31/88 figures, each annual earnings component is successively higher.

361. That, even if the earnings had been volatile, unless a developing history of net operating loss was exhibited, an accurate valuation process would require more justification than given by Mr. Beck for an assumption that the average prudent investor would require the relatively brief period of approximately 37 months for return of investment for an investment to be indicated.

362. This overstates risk, and indicates a degree of investment risk the financial history of this corporation simply does not substantiate. That the evidence shows . . . that the highest interest rate paid by "junk bonds", a higher rate of return being required by an investor for these bonds because of the highest degree of risk incurred by investing in them, was 13.34%.

363. In addition, there was evidence that all NASCAR events have had huge surges in popularity, attendance, and advertising revenues, including television revenues and the Court so finds.

In comparing the rate selected by plaintiff's valuation expert, J. Ray Nicholson, the court stated that "while the capitalization rate selected by Mr. Nicholson of 18% is substantially lower than the defective rate being discussed at this point, it is only a rough corollary to the multiple used in the Excess Earnings methodology and does not perform an identical valuation function." The court had noted earlier in its findings that the capitalization rate obtained by Nicholson under his primary methodology, the income approach, was actually "a discount rate . . . of 18%, minus a risk adjusted growth rate of 6%, giving a capitalization rate, for perpetuity value, of 12%." Thus, because of differences in the methodologies employed and the function of the capitalization rate within each methodology, surface comparison of the capitalization rates selected by the two experts was not overly helpful.

Nicholson's testimony shows, however, that the methodologies used by Beck and Nicholson are comparable in that both utilize a discretionary figure that relates to the risk of the investment, which figure significantly affects the bottom line. Because of this similarity, Nicholson testified at length regarding the degree of risk associated with an investment in CMS. He stated that in his opinion, an investment in the race track industry is no riskier than an investment in the stock market in general, and that if there was any volatility in CMS, it was "all on the upside and increase."

In its findings of fact, the court stated that it was not persuaded that an investment in the racing industry, particularly in CMS, has the high degree of risk claimed by defendant and Beck, but that it also was not persuaded that such an investment is of no greater risk than an investment in the stock market generally. The court further stated that "[c]onsidering all the evidence relating to this factor, including corporate earnings record, history, expansion, competitive position within the industry, and the substantial, expanding reinvestment of capital and capital additions into CMS and by CMS, the Court finds that an appropriate capitalization rate, as of both valuation dates, is 16%." The court noted that this rate was still a conservative one, and applied only to one

portion of the overall income conceptualized as excess earnings under the valuation methodology being utilized.

Defendant contends there is no evidence in the record to support the court's selection of this particular capitalization rate, and that even assuming there is sufficient evidence to support use of this rate, the court failed to make sufficient findings of fact to support its selection. We disagree with defendant's assessment of the sufficiency of the evidence and findings.

The record shows that extensive evidence was presented regarding valuation of CMS, particularly regarding the degree of risk associated with an investment in an asset such as CMS, the effect the degree of risk has on the ultimate value placed on the asset, and the use of a capitalization rate or other means to take into account that risk in placing a value on the asset. Additionally, expert testimony from both Nicholson and Beck was presented regarding an appropriate capitalization rate to be used in valuing CMS under the different methodologies suggested. We do not believe the court was so restricted in its authority that it was prohibited from selecting a capitalization rate of 16% simply because neither expert specifically identified that rate as the appropriate one to be used under the valuation methodology utilized by the court. *See Hartman v. Hartman*, 82 N.C. App. 167, 346 S.E.2d 196 (1986), *aff'd*, 319 N.C. 396, 354 S.E.2d 239 (1987).

This Court has previously recognized that when there is conflicting testimony as to the value of marital property, the court is not required to choose between the values suggested but may arrive at a value of its own choosing so long as that value is based on the appropriate factors to be considered in the valuation process and the evidence. *Nix*, 80 N.C. App. 110, 341 S.E.2d 116. *See also Hartman*, 82 N.C. App. 167, 346 S.E.2d 196. This same flexibility should certainly be afforded the trial court here in selecting an appropriate capitalization rate to be employed under the valuation methodology accepted by the court, particularly given the critical importance and highly discretionary nature of capitalization rates. Just as the trial court is not permitted to merely guess at the value of marital property, *Nix*, 80 N.C. App. 110, 341 S.E.2d 116, however, it may not arbitrarily select a capitalization rate to be used in the valuation process.

It is clear from the findings of fact made in this case that the 16% rate selected by the court was not arbitrarily chosen

but, in fact, resulted from the court's thorough and conscientious review of all the evidence and pertinent factors. We find no abuse of discretion in the court's selection of this rate, *see id.*, and further find sufficient evidence in the record to support its selection and to support the values ultimately obtained by the court for CMS with the use of that rate. Furthermore, we find no deficiency in the findings made by the court in support of its determination of an appropriate capitalization rate.

In sum, we find no error in the court's valuation of CMS. The court valued CMS based on a sound, well-accepted methodology, the excess earnings approach. The court found it necessary to make the adjustments discussed herein to Beck's valuation of CMS utilizing the excess earnings methodology in order to fairly and properly value this asset, and those adjustments are sufficiently supported by the evidence and the findings made. It appears from our review of the entire record, particularly the lengthy judgment of equitable distribution and its extensive findings of fact, that the court reasonably approximated the net value of CMS based on competent evidence and based on a sound valuation methodology; therefore, its valuation shall not be disturbed. *Poore v. Poore,* 75 N.C. App. 414, 331 S.E.2d 266.

## 2. *Provident American Insurance Company*

[7] Defendant next argues the court miscalculated the date of trial value of Provident American Insurance Company ("Provident"), an insurance company that was wholly owned by Sonic as of the date of trial. In valuing Provident, the court accepted the methodology utilized by one of defendant's valuation experts, Mr. Steven H. Mahan, who specializes in valuing insurance companies. Mahan valued Provident by combining the separately obtained values of three components—its adjusted net worth, the value of its insurance in force, and the value of its existing structure. Defendant's primary valuation expert, Beck, then incorporated the value obtained for Provident into the balance sheet on which the various component businesses of Sonic were consolidated. Beck determined the net value of Sonic by combining the values obtained for Sonic's component subsidiaries and partnerships on a balance sheet that also eliminated the carrying value of those same assets on Sonic's books. This was achieved by calculating appraisal increments and decrements, which represented the amount by which an entity's actual value differed from its book value, and incorporating those

increments and decrements into the balance sheet. This approach was the one chosen by both parties and the court for determining the overall value of Sonic.

In calculating Provident's adjusted net worth, Mahan took into consideration a surplus debenture, or note, by which Provident was obligated to repay to Sonic the balance due. The balance due on the note as of the date closest to the date of trial for which its balance could be determined was $1,079,000. The court found that "while this note is a liability of Provident . . . , it is an intercompany asset of Sonic being actively repaid by Provident American, and its value must be added, as of the respective valuation dates, as a part of valuing Sonic's ownership interest in this company."

In reviewing Beck's incorporation of the appraised value of Provident into the consolidated balance sheet, particularly his calculation of the appraisal increment/decrement for Provident, the court found certain inaccuracies relating to consideration of the surplus note. It first found that $1,079,000 needed to be added to the appraised value of Provident because that amount had been erroneously deducted twice. Beck conceded that this error had occurred and that this addition was necessary. Second, the court found that the book value of Sonic's investment in Provident as of the date of trial was not $5,295,000 as determined by Beck, but instead was $4,217,000 as shown by the 31 December 1989 consolidated balance sheet for Sonic offered as defendant's exhibit 109-H. The difference between the book value as set by the court and as set by Beck is attributable to the balance of the surplus note. Beck, on cross-examination, conceded that the $4,217,000 figure appearing on the 31 December 1989 balance sheet included Sonic's investment in both Provident's stock and the surplus note, and that therefore an additional $1,079,000 adjustment to his figures needed to be made. After a break in the proceedings during which Beck consulted with defendant's accountant, Bill Brooks, Beck attempted to retract this concession. The court obviously was not persuaded by Beck's retraction and agreed with plaintiff that two separate adjustments of $1,079,000 were needed to Beck's calculations.

Defendant contends that the adjustments made by the court concerning valuation of Provident were improper, are not supported by the evidence, and that as a result, the value set for Sonic

as of the date of trial is $2,157,000 (two times $1,079,000) more than it should be. We reject this contention. Notwithstanding defendant's assertion to the contrary, there is support in the record for the trial court's findings that $1,079,000 needed to be added to the appraised value of Provident as incorporated by Beck and that the book value of Sonic's investment in Provident as of the date of trial was $4,217,000. This support comes both from Beck's testimony on cross-examination and from defendant's own exhibits. Once again, there was a conflict in the evidence regarding whether adjustments to Beck's valuation were needed, which conflict was resolved by the court in plaintiff's favor. Since there is competent evidence in the record that supports the court's findings regarding the adjustments made, those findings are binding and shall not be disturbed. *Nix*, 80 N.C. App. 110, 341 S.E.2d 116. Accordingly, we find no error in the court's valuation of Provident or its calculation of the appraisal increment/decrement for that entity.

### 3. Town and Country Ford, Inc.

[8] Defendant next argues the court erred in its valuation of Town and Country Ford ("Town and Country"), an automobile dealership that is a wholly owned subsidiary of Sonic. The court valued Town and Country by use of the industry standard approach, the approach utilized by plaintiff's expert, Nicholson. Under this approach, the value of the dealership is determined by adding the net "hard asset" value (the value of its hard assets minus its liabilities) and its "blue sky" value.

The expert testimony showed that the blue sky value is basically the value of the dealership over and above the value of its hard assets and is roughly equivalent to goodwill. The blue sky value is determined by multiplying the average pre-tax income of the dealership by a franchise multiple of one to five. The multiple chosen is subjective and is based upon factors such as the type of franchise, its market performance, location, demographics, median income, economy status, sales, and number of locations. The court here used a multiple of three in determining the date of separation value of Town and Country and a multiple of two for the date of trial value. Defendant contends there was no basis for the franchise multiples used by the court and that therefore its valuation of this asset is fatally flawed. We disagree.

Defendant presented evidence showing that Town and Country had a value of $4,900,000 as of the date of separation and $2,400,000

as of the date of trial. These values were obtained, however, by use of a methodology that was not accepted by the court. The court accepted as valid the industry standard approach, used by Nicholson, noting that it was recognized by a national automobile dealers association as a legitimate tool for valuing automobile dealerships. The court found error in Nicholson's application of this methodology, however, in that Nicholson used franchise multiples that the court found inaccurately high. Nicholson valued Town and Country at $7,938,000 as of the date of separation with use of a multiple of five and at $1,931,000 as of the date of trial with use of a multiple of three. The trial court, using multiples of three and two, respectively, valued Town and Country at $5,494,000 as of the date of separation and $876,000 as of the date of trial.

The court made numerous findings regarding the multiples selected including the multiples selected by Nicholson and his justification for his selections; alternative computations of the blue sky component offered by defendant's witnesses, including alternative computations made by defendant's witness, Brooks, with use of different multiples; and the multiples selected by the court, including the reason for its use of a lower multiple for determining the date of trial value. The findings show, among other things, that the dealership declined in value in the two years preceding the trial due to a decrease in earnings and a slowdown in the economy and that, as a result, use of a lower multiple for determining its date of trial value was necessary to reflect that decline. Moreover, extensive evidence was presented regarding computation of a dealership's blue sky value and selection of an appropriate multiple. In fact, sufficient evidence was presented that defendant's counsel stated to the court that "when this case is over there will be enough evidence for the Court to make its own determination as to what the Court thinks is the blue-sky value, and the Court may or may not choose to use a multiple," thereby inviting the court to select its own multiples.

We conclude there is a sufficient basis in the record for the franchise multiples selected by the court. As is demonstrated by the findings made, the multiples selected by the court were not arbitrarily chosen but were based on the court's consideration of appropriate factors and the evidence. We further conclude that the values obtained with the use of the multiples selected by the court are adequately supported by the evidence and the findings and appear to be a reasonable approximation of the value of this

entity. We therefore find no error in the court's valuation of Town and Country.

### 4. *Frontier Oldsmobile-Cadillac, Inc.*

[9]   Defendant assigns as error the court's valuation of Frontier Oldsmobile-Cadillac, Inc. ("Frontier Oldsmobile"), on the ground the evidence is insufficient to support the court's findings regarding the value of this business. Frontier Oldsmobile is an automobile dealership that was purchased by defendant and Sonic in September 1988, after the date of the parties' separation. As of the date of trial, Sonic owned 85% of the stock in the corporation and defendant owned the remaining 15%. Since this entity was not owned by either of the parties as of the date of separation, it was not subject to distribution but was properly considered by the court as a factor in determining an equitable distribution. N.C. Gen. Stat. § 50-20(b) and (c).

Plaintiff's expert, Nicholson, used the industry standard approach to value Frontier Oldsmobile. In valuing the business, Nicholson did not calculate any blue sky value for the entity but did include certain intangible assets, which were listed as assets on Frontier Oldsmobile's books, in his calculation of the hard asset value. The court accepted the methodology used by Nicholson and the values obtained by use of that methodology in valuing the business. Defendant contends the evidence does not support the court's valuation of this entity because the value of these intangible assets was allegedly erroneously included in the hard asset value of the business.

The trial court expressly recognized in its judgment that the hard asset value as determined by Nicholson included intangible assets, consisting of franchise rights and non-compete contractual rights. The court found that although it was a misnomer to include intangible assets within the "hard asset" value, it was not an inaccuracy since Nicholson had not included those assets, which have a computable value, as part of a blue sky component. The court's finding regarding the inclusion of the intangible assets in the hard asset value of the business is supported by Nicholson's testimony and is therefore conclusive on appeal. *Nix*, 80 N.C. App. 110, 341 S.E.2d 116. The evidence supports the findings made regarding the value of Frontier Oldsmobile; therefore, this assignment of error is overruled.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

### 5. Chartown

[10] Defendant next assigns as error the value placed on Chartown as of the date of trial. Chartown is a partnership owned by CMS and Town and Country, whose assets consist of parcels of real property including a 17.97 acre tract of land located on Krefield Drive in Charlotte. Defendant contends the evidence is insufficient to support the court's finding that the fair market value of the Krefield Drive property remained constant from the date of separation to the date of trial. Defendant presented evidence showing that the value of the Krefield Drive property decreased between the dates of separation and trial, and plaintiff presented evidence showing that the property had increased in value during this time. The court was not persuaded that the property either increased or decreased in value during this period but accepted as accurate the comparable range of values utilized by defendant's expert. The court's finding regarding the date of trial value of the Krefield Drive property is supported by the comparable range of values established by defendant's expert as reliable indicators of the date of trial value of this property; therefore, we overrule this assignment of error as well. See Nix, 80 N.C. App. 110, 341 S.E.2d 116.

### B. The Marital Home

[11] Defendant also assigns as error the value placed on the marital home as of the date of trial. For the most part, the court accepted the values placed on the marital home by defendant's expert, Kelly I. Harris. Harris, however, made a $75,000 downward adjustment to the date of trial value based on several items of deferred maintenance on the property. The court found that this adjustment was inaccurately high, that a more accurate adjustment would be $50,000, and therefore determined that the date of trial value was $25,000 higher than the value set by Harris. Defendant contends there is no evidence in the record to support the court's adjustment to Harris's valuation. The record shows that when Harris was questioned about her $75,000 downward adjustment, she conceded that it was difficult to estimate the cost of the repairs needed to the property but that she estimated the cost to be $50,000 to $75,000. This testimony is sufficient to support the court's finding regarding the appropriate adjustment to be made and the resulting higher value placed on the property. We find no error as claimed by defendant in the court's valuation of the marital home.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

*DISTRIBUTION*

The trial court's final task is to determine what constitutes an equitable distribution of the marital property. To guide courts in making this determination, our Supreme Court has stated:

> [N.C. Gen. Stat. § 50-20] is a legislative enactment of public policy so strongly favoring the equal division of marital property that an equal division is made *mandatory* "unless the court determines that an equal division is not equitable." N.C.G.S. 50-20(c). The clear intent of the legislature was that a party desiring an unequal division of marital property bear the burden of producing evidence concerning one or more of the . . . factors in the statute and the burden of proving by a preponderance of the evidence that an equal division would not be equitable. Therefore, if no evidence is admitted tending to show that an equal division would be inequitable, the trial court *must* divide the marital property equally.
>
> When evidence tending to show that an equal division . . . would not be equitable is admitted, however, the trial court must exercise its discretion in assigning the weight each factor should receive in any given case. It must then make an equitable division of the marital property by balancing the evidence presented by the parties in light of the legislative policy which favors equal division.

*White v. White*, 312 N.C. 770, 776-77, 324 S.E.2d 829, 832-33 (1985). The trial court is vested with such wide discretion in carrying out this task that its distribution will not be disturbed on appeal absent a showing that the distribution is manifestly unsupported by reason. *White*, 312 N.C. 770, 324 S.E.2d 829. One restriction on the court's exercise of its discretion, however, is that the court must make findings and conclusions that support its division, including findings sufficient to address the statutory factors on which evidence was presented. *Armstrong v. Armstrong*, 322 N.C. 396, 368 S.E.2d 595 (1988).

The parties here have presented numerous issues pertaining to the distribution ordered. Although we reject most of the arguments presented, we agree there is error in the distribution that requires this matter be remanded to the trial court for redetermination of an equitable distribution.

## A. Consideration of Distributional Factors

Defendant argues the court erred by "failing to find and consider distributional factors which were raised and supported by the evidence and law." Specifically, defendant assigns as error the court's failure: (1) to find facts and consider his evidence regarding plaintiff's alleged economic misconduct and lack of homemaker contributions; and (2) to take into consideration the adverse tax consequences to defendant inherent in its distributive award.

### 1. Plaintiff's homemaker contributions

[12] Defendant first contends the evidence shows that the only contributions made by plaintiff to the marriage and the marital estate were her "intangible or indirect" contributions as a spouse, parent, or homemaker; that plaintiff's contributions were "at best minimal"; and that it was prejudicial error for the court to fail to give weight to the evidence showing plaintiff's lack of contribution. In determining an equitable distribution, the court must consider "[a]ny equitable claim to, interest in, or direct or indirect contribution made to the acquisition of such marital property by the party not having title, including joint efforts or expenditures and contributions and services, or lack thereof, as a spouse, parent, wage earner or homemaker." N.C. Gen. Stat. § 50-20(c)(6). The court here expressly found that: "Both parties offered evidence on this factor regarding Plaintiff's role or lack thereof as a spouse, parent, wage earner or homemaker. The Court has considered, but chooses not to give weight to, this factor, and therefore makes no further findings on it." Thus, the judgment shows the court considered the evidence presented on this statutory factor and made a finding of fact regarding that evidence, and the weight assigned it. Defendant's assignment of error that the court failed to find facts and consider his evidence regarding plaintiff's lack of homemaker contributions is, therefore, patently meritless.

Defendant's real dissatisfaction here is with the weight the court chose to give this factor. The weight to be given any factor is a matter committed to the discretion of the trial court. *White*, 312 N.C. 770, 324 S.E.2d 829. We cannot say the court's decision not to give greater weight to this particular factor is manifestly unsupported by reason; therefore, we find no error in the court's consideration of this evidence.

### 2. Marital misconduct

**[13]**  As part of this same argument, defendant next contends the court erred by refusing to consider his evidence of plaintiff's alleged economic misconduct. Defendant states that he "attempted to offer evidence to show both the inclination and opportunity of [plaintiff] to commit adultery, as well as the availability and use of a substantial amount of marital funds to facilitate its commission." The court excluded the evidence on the basis it was evidence of non-economic fault. Defendant contends the evidence of plaintiff's misconduct was relevant to show plaintiff's dissipation of marital assets for a nonmarital purpose, and that its exclusion was prejudicial error.

In *Smith v. Smith*, 314 N.C. 80, 81, 331 S.E.2d 682, 683 (1985), our Supreme Court held that:

> [M]isconduct during the marriage which dissipates or reduces the value of marital assets for nonmarital purposes may properly be considered under N.C.G.S. 50-20(c)(12). Marital fault or misconduct which does not adversely affect the value of marital assets is not a just and proper factor within the meaning of N.C.G.S. 50-20(c)(12).

The Court explained that since the first eleven factors set forth in N.C. Gen. Stat. § 50-20(c) all concern the economy of the marriage, the only other considerations that are "just and proper" and therefore appropriate for consideration under N.C. Gen. Stat. § 50-20(c)(12) are those that are relevant to the marital economy. The Court therefore ruled that "marital fault or misconduct of the parties which is not related to the economic condition of the marriage is not germane to a division of marital property under 50-20(c) and should not be considered." *Smith*, 314 N.C. at 87, 331 S.E.2d at 687.

Although the trial court refused to hear or consider defendant's tendered evidence, it permitted defendant to make an offer of proof to show the substance of the excluded evidence for purposes of appellate review. The offer of proof, together with the other evidence presented, shows that during one period of the marriage, from approximately 1985 until the spring of 1987, plaintiff went on numerous trips to health spas, resort cities, and other places with the use of marital funds; that she went on the trips without defendant, but with his permission; and that she committed adultery while on some of the trips. Plaintiff admitted that the

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

adultery occurred while she was on the trips, but denied that the purpose of any of the trips was to commit adultery, or to facilitate its commission, and denied spending any monies on the men with whom she became involved.

After reviewing the offer of proof, we conclude the proffered evidence was properly excluded. The offer of proof does not show that plaintiff's misconduct dissipated or reduced the value of marital assets or was related to the economic condition of the marriage. It is clear the tendered evidence was offered to prejudice the court against plaintiff based on her misconduct, rather than to show any economic impact on the marriage resulting from that conduct; therefore, it was not evidence that could be appropriately considered in determining an equitable distribution. *Smith*, 314 N.C. 80, 331 S.E.2d 682.

### 3. Tax consequences

[14] Finally, defendant contends the court erred by failing to consider the adverse tax consequences to him inherent in its distributive award. Pursuant to N.C. Gen. Stat. § 50-20(c)(11), the court is to consider the tax consequences to each party in determining an equitable distribution. Notwithstanding defendant's assertion to the contrary, the court did consider this statutory factor and made a finding of fact regarding it. The court found that neither party had offered evidence regarding specific tax consequences that might result from the equitable distribution, but that other evidence regarding taxes had been presented with respect to various points, which evidence the court considered.

Defendant notes, however, that the court, in ordering him to make an initial lump sum payment of $2,144,971 towards the distributive award, specifically found that defendant has the ability to pay that amount either from the sale of assets distributed to him, or by borrowing, or by a combination of both means. Defendant contends this finding shows that the court realized he would likely have to sell some of his assets in order to comply with the judgment, that it is "common knowledge" that adverse tax consequences will result from such a sale, and that the court should have considered those tax consequences in determining an equitable distribution. We find this contention unpersuasive.

As the party seeking an unequal division of marital property in his favor, defendant had the burden of producing evidence con-

cerning the tax consequences of the anticipated distribution. *See White*, 312 N.C. 770, 324 S.E.2d 829. He failed to present any such evidence. As plaintiff correctly notes in her brief, "common knowledge" is not evidence. In the absence of evidence concerning the tax consequences of the anticipated distribution, the court may still properly consider the tax consequences in determining an equitable distribution but it is not required to do so. *Lawing v. Lawing*, 81 N.C. App. 159, 344 S.E.2d 100 (1986). Moreover, even when evidence pursuant to this factor is presented, the court is only required to consider the tax consequences that will result from the distribution the court actually orders. *Weaver v. Weaver*, 72 N.C. App. 409, 324 S.E.2d 915 (1985).

The parties here stipulated to the in-kind distribution of some of the marital assets and expressed to the court their preference that the remaining marital assets, except the proceeds in two relatively small bank accounts, be distributed in kind to defendant. For the court to distribute the property consistent with the parties' stipulations and preferences, a sizable distributive award to plaintiff was obviously going to be required. Despite this obvious result, defendant presented no evidence regarding the adverse tax consequences he now claims are inherent in the distributive award. Furthermore, the tax consequences now claimed by defendant are of a purely speculative nature and are not inherent in the distribution actually ordered. For these reasons, we find no error in the consideration given this factor by the court.

### B. *Postseparation Appreciation and Depreciation of Marital Property*

[15] Defendant's next argument pertains to the court's treatment of the postseparation appreciation and depreciation of the marital property. Defendant assigns as error the court's failure to make findings of fact distinguishing between the postseparation active versus passive appreciation (or depreciation) of the marital property and failure to consider those findings in determining an equitable distribution. Although we do not agree that the court's findings concerning the postseparation appreciation of the marital property are insufficient, we agree there is error in the court's treatment of the postseparation appreciation that requires that this matter be remanded to the trial court for correction.

The court made detailed findings regarding the changes in value of the marital property occurring after the date of separation.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

Those findings show that after the date of separation, some of the marital assets decreased in value, while others increased in value. The court subtracted the total of the depreciation of the marital assets from the total of the appreciation of the assets and thereby determined that since the date of separation there had been a $6,546,805 net increase in value of the marital estate. Since, by the distribution ordered, defendant was awarded all of the assets that had appreciated in value, the court gave plaintiff an "adjustive credit" equal to 31% of the net postseparation appreciation of the marital estate, or $2,029,509, and added that amount to the share of the marital property awarded plaintiff. In so doing, the court actually distributed part of the postseparation appreciation of the marital property to plaintiff and thereby exceeded its authority.

"[T]his Court has held that post-separation appreciation of a marital asset, whether passive appreciation or appreciation due to the efforts of an individual spouse, is not marital property and cannot be distributed by the court." *Chandler v. Chandler*, 108 N.C. App. 66, 68, 422 S.E.2d 587, 589 (1992). Instead, the increase in value of marital assets between the date of separation and the date of trial should be considered by the court pursuant to N.C. Gen. Stat. § 50-20(c)(11a) or (c)(12) in determining what constitutes an equitable distribution of the marital estate. *Chandler*, 108 N.C. App. 66, 422 S.E.2d 587; *Gum v. Gum*, 107 N.C. App. 734, 421 S.E.2d 788 (1992); *Truesdale v. Truesdale*, 89 N.C. App. 445, 366 S.E.2d 512 (1988). "Rather than distributing the sums representing the appreciation, the trial court must consider the existence of this appreciation, determine to whose benefit the increase in value will accrue, and then consider that benefit when determining whether an equal or unequal distribution of the marital estate would be equitable." *Gum*, 107 N.C. App. at 738, 421 S.E.2d at 790.

Because the court here distributed part of the postseparation appreciation, this cause must be remanded for redetermination of what constitutes an equitable distribution of the marital estate and entry of a new judgment. We recognize that on remand the court may determine, after considering the existence of the postseparation appreciation in the value of the assets distributed to defendant, that plaintiff must receive a greater percentage than 31% of the marital property in order to achieve an equitable distribution. That would certainly be permissible and within the discretion of the trial court and is the appropriate means by which to take

into consideration the increase in value of marital assets occurring after the date of separation.

[16] On a related note, both parties concede the court made a clerical error in its calculation of the net postseparation increase in value of the marital assets in that the court erroneously listed the amount of appreciation in the marital home, $25,405, in the depreciation column, rather than in the appreciation column. This error should be corrected on remand as well. We reject defendant's argument that the correct amount to be listed as the postseparation appreciation in the marital home is $9,999.35, rather than $25,405, with the difference being attributable to payments made by defendant towards the first mortgage on the property. The judgment shows the court chose to give defendant credit for those mortgage payments at another point in its calculations, rather than include them in its calculation of the net postseparation appreciation of the marital property, and we find no error in that decision.

[17] Defendant further contends the court, in considering the postseparation appreciation as a distributional factor, must distinguish between the appreciation that is active in nature, and the appreciation that is passive in nature, and make findings of fact in effect classifying the appreciation in each asset as either active or passive. We find no support for this position in G.S. § 50-20 or in the cases interpreting that statute and decline to impose this unnecessary burden on the trial court.

The distinction between active and passive appreciation in the value of an asset occurring during marriage and before the date of separation must necessarily be drawn in order to classify property as either marital or separate, and thereby identify the property subject to distribution. It is not essential that this same distinction be drawn with respect to appreciation occurring after the date of separation since that appreciation is not marital property and not subject to distribution. This Court has previously recognized that there are limits on what can reasonably be required of the trial court with respect to its consideration of evidence presented pursuant to G.S. § 50-20(c). See Gum, 107 N.C. App. 734, 421 S.E.2d 788 (Where this Court refused to require the trial court to place a value on the contribution made by one spouse towards the education and career development of the other spouse.). Although it is certainly appropriate, and indeed desirable, for the trial court in determining an equitable distribution to take into

consideration whether the postseparation appreciation of the marital property is passive appreciation, or resulted from the efforts of one or both of the spouses, the court is not required to make specific findings of fact classifying the appreciation as either passive or active. We find no error, therefore, in the court's failure to make additional findings concerning the nature of the postseparation appreciation.

Finally, as part of this same argument, defendant contends the court improperly refused to consider the net postseparation depreciation in the value of his interest in the Riverfall Partnership. The record shows that the property held by the Riverfall Partnership was acquired by Chartown after the date of the parties' separation, that the depreciation referred to by defendant was included in the court's calculation of the date of trial value of Chartown, and that ample findings of fact were made regarding the Riverfall Partnership and property and the decline in value of that property after the date of separation. We find no error in the consideration afforded the postseparation depreciation of this asset.

## C. Credits for Postseparation Expenditures

[18] Both parties present arguments pertaining to the credit given defendant for certain postseparation expenditures. Defendant argues the court erred by failing to give him a dollar-for-dollar credit for payments he made after the date of separation to preserve marital property and to reduce marital debts. Based on the assignments of error listed as corresponding to this argument, it appears that the payments made by defendant for which he seeks additional credit consist of interest payments on the first mortgage on the marital home; payments reducing certain debts associated with defendant's business interests, which were found to be marital debts; and advances to preserve the assets of one of the partnerships in which defendant is a general partner, Gardner-Smith Associates. Defendant contends he spent millions of dollars servicing marital debt and preserving marital property since the date of separation, but only received a credit for his reduction of the principal on the two mortgages on the marital home, and for his payment of property taxes. Defendant contends he should have received a greater credit and that it is unfair to permit trial courts to "only loosely consider" postseparation payments made to preserve marital property and to reduce marital debt as distributional factors. Plaintiff, on the other hand, argues that the court, in effect,

gave defendant greater credit than it should have for his postsepara-
tion payments made towards the mortgages on the marital home
and property taxes.

The judgment shows that the court gave defendant a full credit
for his payment of the property taxes due on the marital home,
a full credit for his discharge of the second mortgage on the home,
and a partial credit for mortgage payments made towards the first
marital home mortgage, and considered the remaining payments
made by defendant to reduce marital debts and to preserve marital
property as distributional factors in determining what constituted
an equitable distribution. The court found that as of the date of
separation, the marital home was encumbered by two mortgages — a
first mortgage with a balance due as of that date of $388,738,
and a second mortgage with a balance due of $189,956. Between
the dates of separation and trial, defendant caused the second
mortgage to be retired in its entirety, made property tax payments
on the home totalling $19,907.14, and made payments towards the
first mortgage totalling $103,333.72. Of the payments made towards
the first mortgage, $15,405.65 reduced the principal owed on the
mortgage and the remaining $87,928.07 consisted of interest
payments. The court gave defendant a full dollar-for-dollar credit
for the property tax paid, his discharge of the second mortgage,
and the principal payments made towards the first mortgage, in
the total amount of $225,268.79, which amount was subtracted from
plaintiff's distributive award. In keeping with the parties' stipula-
tions, the court also gave defendant a full credit for the funds
advanced by him for the purchase of a residence and furnishings
for plaintiff and the parties' children.

The court specifically found that it was not equitable to grant
defendant a credit for his interest payments on the first mortgage
because defendant had the benefit of the use and possession of
the marital home since the date of separation and the benefit of
a reduced income tax liability because of the interest payments
made. Complicating matters, however, the court further stated that
to avoid a double treatment of defendant's discharge of the second
mortgage, which increased the net value of the home as of the
date of trial by $189,956, the court was going to subtract that
amount from the postseparation appreciation attributed to this asset.

Apparently, the remaining postseparation payments for which
defendant claims he was entitled to a dollar-for-dollar credit consist

of his advances towards the partnership, Gardner-Smith Associates; his discharge of the Riverfall Partnership debt, the STC properties' debt, and the NCNB debt; and his payments reducing his debt to Sonic. In considering the factors set forth at N.C. Gen. Stat. § 50-20(c) in determining an equitable distribution, the court found, pursuant to N.C. Gen. Stat. § 50-20(c)(11a), that:

> Defendant has since the date of separation expended substantial monies in an endeavor to preserve all property, whether marital or separate. Marital debts outstanding as of the time of separation have been paid as found elsewhere herein. The [marital] residence has been maintained. A new home . . . was purchased for Plaintiff and paid for by Defendant. Advances have been made by Defendant to prevent the loss of real estate held by the partnership, Gardner-Smith Associates. Defendant has obtained release of in excess of $13,000,000.00 in outstanding judgments owing on the date of separation.

Pursuant to N.C. Gen. Stat. § 50-20(c)(12), the court further found that defendant had "made certain payments since the date of separation benefitting the marital estate, including . . . principal, interest, insurance and property taxes [on the marital home], advances to preserve Gardner-Smith, Sonic debt paid, STC debt paid and the NCNB debt paid . . . ." In addition to these findings, the judgment contains a portion devoted exclusively to the marital debts, consisting of findings of fact numbers 836-904, in which the court addresses in detail each of the alleged marital debts, including the two mortgages on the marital home, the STC debt, the debt owed to Sonic, the NCNB debt, the debts associated with the Riverfall Partnership, as well as other debts, and payments made by defendant after the date of separation towards those debts.

To evaluate the merits of the arguments presented by the parties, we must review the law in this State regarding marital debts and postseparation payments made towards marital debts in the equitable distribution context. In determining an equitable distribution, the trial court must consider the debts of the parties. *See Rawls v. Rawls*, 94 N.C. App. 670, 381 S.E.2d 179 (1989); *Byrd v. Owens*, 86 N.C. App. 418, 358 S.E.2d 102 (1987). If the debt is a separate debt of one of the parties, then the court must consider it pursuant to N.C. Gen. Stat. § 50-20(c)(1). *Byrd*, 86 N.C. App. 418, 358 S.E.2d 102. If the debt is a marital debt, that is, a debt incurred during the marriage for the joint benefit of the parties,

then it must be valued and distributed. *Id.* Payments made after the date of separation towards marital debts or obligations flowing from marital property, including mortgage payments and payment of property taxes, have been treated by this Court as payments made towards a marital debt. *See, e.g., Bowman v. Bowman,* 96 N.C. App. 253, 385 S.E.2d 155 (1989); *McLean v. McLean,* 88 N.C. App. 285, 363 S.E.2d 95 (1987), *aff'd,* 323 N.C. 543, 374 S.E.2d 376 (1988).

"The court has the discretion, when determining what constitutes an equitable distribution of the marital assets, to also apportion or distribute the marital debts in an equitable manner." *Geer v. Geer,* 84 N.C. App. 471, 475, 353 S.E.2d 427, 429-30 (1987). *See also Rawls,* 94 N.C. App. 670, 381 S.E.2d 179. The manner in which the court distributes or apportions marital debts, which necessarily includes taking into consideration payments made after the date of separation towards those debts, is a matter committed to the discretion of the trial court. *Rawls,* 94 N.C. App. 670, 381 S.E.2d 179; *Geer,* 84 N.C. App. 471, 353 S.E.2d 427. This Court, in reviewing the treatment of marital debts and postseparation payments made towards those debts, has approved the apportioning of debts between the parties, *Geer,* 84 N.C. App. 471, 353 S.E.2d 427; ordering one spouse to reimburse the other spouse for payments made towards the debts, *Bowman,* 96 N.C. App. 253, 385 S.E.2d 155; *Rawls,* 94 N.C. App. 670, 381 S.E.2d 179; consideration of postseparation payments as a distributional factor, *Haywood v. Haywood,* 106 N.C. App. 91, 415 S.E.2d 565 (1992), *rev'd in part and remanded on other grounds,* 333 N.C. 342, 425 S.E.2d 696 (1993); *Fox v. Fox,* 103 N.C. App. 13, 404 S.E.2d 354 (1991); and *Miller v. Miller,* 97 N.C. App. 77, 387 S.E.2d 181 (1990); "crediting" a spouse in an appropriate manner for postseparation payments made, *Hendricks v. Hendricks,* 96 N.C. App. 462, 386 S.E.2d 84 (1989), *cert. denied,* 326 N.C. 264, 389 S.E.2d 113 (1990); *McLean,* 88 N.C. App. 285, 363 S.E.2d 95; and *Hunt v. Hunt,* 85 N.C. App. 484, 355 S.E.2d 519 (1987); and actual use of a credit, *Smith v. Smith,* 104 N.C. App. 788, 411 S.E.2d 197 (1991). Additionally, our Supreme Court impliedly approved the use of a credit as a means of taking into consideration postseparation payments made towards marital debts in *Wiencek-Adams v. Adams,* 331 N.C. 688, 417 S.E.2d 449 (1992).

Determination of the appropriate treatment of marital debts and postseparation payments made towards those debts depends

## SMITH v. SMITH

[111 N.C. App. 460 (1993)]

upon the particular facts of each case and is left to the discretion of the trial court, included within the discretion afforded the court generally in determining what constitutes an equitable distribution. *White v. White*, 312 N.C. 770, 324 S.E.2d 829 (1985); *Edwards v. Edwards*, 110 N.C. App. 1, 428 S.E.2d 834 (1993); *Rawls*, 94 N.C. App. 670, 381 S.E.2d 179; *Geer*, 84 N.C. App. 471, 353 S.E.2d 427. "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *White*, 312 N.C. at 777, 324 S.E.2d at 833.

Looking first at the court's treatment of defendant's postseparation mortgage payments and payment of property taxes, we find no abuse of discretion in the court's decision not to give defendant a credit, or reimbursement, for the interest portion of his mortgage payments. The court's decision not to give defendant a credit for that portion of his payments was not arbitrary but instead was a reasoned decision, as shown by the findings of fact. *See White*, 312 N.C. 770, 324 S.E.2d 829. We further find no abuse of discretion in the court's decision to reimburse defendant in full, by way of a credit, for his payment of the property taxes due on the marital home. Plaintiff contends that since defendant had the use of the home after the date of separation and received the home in the distribution, and she did not, defendant should only have been partially reimbursed for his tax payments. The court's decision to give defendant a full, rather than a partial, credit for his tax payments does not appear to be manifestly unsupported by reason; therefore, we shall not disturb it. *Id.*

We agree with plaintiff, however, that it appears defendant was erroneously given double credit for his discharge of the second mortgage. By giving defendant a full credit for his discharge of the second mortgage, the court reimbursed defendant in full for his expenditure towards that debt and restored him to the position he would have been in, monetarily, had he not made any payments towards that debt, thereby putting the parties on equal footing with respect to that debt and asset. Defendant's discharge of the second mortgage increased the net value of the marital home as of the date of trial by $189,956, which increase inured to the benefit of defendant since he was awarded the home. Since defendant received the benefit of that increase in value by the distribution of the home to him, plaintiff was entitled to have that increase taken into consideration by the court in determining an equitable

distribution. This was not done, however, because the court did not include the amount of the second mortgage in the total of the postseparation appreciation of the marital property, thereby depriving plaintiff of the benefit from the increase in value of the home to which she was entitled. On remand, the court should either include the $189,956 in the postseparation appreciation considered by it in determining what division is equitable, or explain more fully in its findings of fact how deletion of this amount from the postseparation appreciation does not result in a double credit to defendant.

Plaintiff also argues that the court erred by giving defendant a credit against the distributive award for his reduction of principal on the first mortgage. She contends it would have been more appropriate for the court to credit defendant for those payments through its calculation and consideration of the postseparation appreciation on the home. We find no abuse of discretion in the manner chosen by the court for crediting defendant for his principal payments.

With respect to defendant's reduction of the debts associated with his business interests and advances towards Gardner-Smith Associates, the judgment shows the court chose to give defendant credit for those payments by considering them as a factor in determining what distribution was equitable. The court's decision to credit defendant in that manner, rather than by giving him a dollar-for-dollar credit for the payments made, is not manifestly unsupported by reason and therefore is not an abuse of discretion. *See White*, 312 N.C. 770, 324 S.E.2d 829. Furthermore, it is clear from the judgment as a whole, particularly the detailed findings made regarding the marital debts and defendant's payments towards those debts, that the court did not just "loosely" consider defendant's payments but instead gave them the serious and extensive consideration they deserved. Accordingly, we reject defendant's argument that he was not given sufficient credit for his postseparation expenditures.

### D. Distribution of the Marital Debts

[19] Defendant argues the court erred by distributing all of the marital debts to him. He contends that a proportionate share of the debts should have been assigned to plaintiff and that distribution of all the debts to him constitutes an abuse of discretion. We find this argument unpersuasive.

The judgment shows the court made extensive findings of fact regarding the debts of the parties, both separate and marital. With respect to the debts alleged to be marital, the court addressed each individual debt; the balance due on each debt as of the date of separation and the date of trial; events occurring after the date of separation with respect to the debts, including payments made towards the debts; and, where appropriate, whether the debt had been taken into consideration by the court in determining the net value of the asset to which the debt was attached. For purposes of clarity, the court also included in its judgment a chart listing the marital debts and the balance due on each debt as of the pertinent dates. The chart shows that there were marital debts totalling $28,054,292 as of the date of separation and $23,829,680 as of the date of trial. With respect to those debts, the court found that, except for the mortgage remaining on the marital home and the mortgage associated with the residence purchased by defendant for plaintiff and the children, that:

> [E]ach of these marital debts are of a business nature, and are integrally related to the continuing, complex business activities of the Defendant, all of which are extremely interrelated, and none of which, to any practical extent, can be segregated from the complex interrelationship of the Defendant's holdings and capital financings. Considering their nature, and the substantial disparity between the incomes of each party, none could be borne by the Plaintiff.

In addition, the court found that defendant had guaranteed the payment of various debts of the business entities controlled by him, which debts totalled $53,566,536 as of the date of trial. This amount includes $20,150,000 attributable to defendant's purchase of the Atlanta Motor Speedway one week before the equitable distribution trial began. With respect to these debts guaranteed by defendant, the court found:

> That it is unknown . . . whether the Defendant will ever be called upon to pay any of these debts. Some occurred after separation. The history of the Defendant's business activities reveals a pattern by which actual "personal" exposures are eliminated by transactions which functionally shift the debts involved to one or more of the separate entities which are controlled by him.

Based on these findings, the court distributed all of the marital debts to defendant.

Distribution of the marital debts is a matter committed to the discretion of the trial court. *Rawls*, 94 N.C. App. 670, 381 S.E.2d 179; *Geer*, 84 N.C. App. 471, 353 S.E.2d 427. Although defendant was assigned all the marital debts, which had a total balance due as of the date of distribution of $23,829,680, he was also awarded all of the property to which the debts were attached, except the residence purchased for plaintiff, and the existence of the debt was included in calculation of the net value of that property. The only part of the assigned debt that was not taken into consideration in valuation of the marital property was a total of $6,135,611, representing debts owed to Sonic and its subsidiary, CMS, entities subject to defendant's control and manipulation. Defendant's control over those entities would certainly appear to include the ability to shift these debts elsewhere at some point or possibly even eliminate them; therefore, their true value as a liability is questionable. Given the circumstances and the distribution ordered, we see no abuse of discretion in the court's decision to distribute all of the marital debts to defendant.

### E. Unequal Distribution

Plaintiff assigns as error the court's determination that an equitable distribution is an unequal one in which defendant is awarded 69% of the marital property and plaintiff only 31%. She contends this unequal distribution constitutes an abuse of discretion and reversible error. Because we have determined that this case must be remanded to the trial court for redetermination of what constitutes an equitable distribution, we need not address plaintiff's contention. We note, however, that the trial court's determination as to an equitable division of the marital property is one that is to be accorded great deference and will not be upset on appeal absent a showing that it was so arbitrary that it could not have been the result of a reasoned decision. *White*, 312 N.C. 770, 324 S.E.2d 829.

### F. The Distributive Award

[20]   Both parties present arguments pertaining to the distributive award ordered by the court. Plaintiff contends the court erred and abused its discretion by structuring payment of the award over a period of ten years. Defendant contends the court erred

**SMITH v. SMITH**

[111 N.C. App. 460 (1993)]

and abused its discretion by ordering him to pay a distributive award of over $15 million without making any findings from which it could reasonably be concluded that he has the ability to comply with the judgment without suffering catastrophic economic consequences. Because of the likelihood that on remand plaintiff will be awarded her share of the marital property by a substantially similar distributive award, we find it appropriate to address the parties' arguments.

N.C. Gen. Stat. § 50-20(e) authorizes the trial court to provide for a distributive award whenever a distribution of all or portions of the marital property in kind would be impractical or whenever a distributive award is necessary to facilitate, effectuate, or supplement a distribution of the marital property. *Sonek v. Sonek*, 105 N.C. App. 247, 412 S.E.2d 917, *disc. review allowed*, 331 N.C. 287, 417 S.E.2d 255 (1992); *Harris v. Harris*, 84 N.C. App. 353, 352 S.E.2d 869 (1987). Although the court may make the distributive award payable over an extended period of time, it may not order that an award be paid over a period in excess of six years after the date of the cessation of the marriage "except upon a showing by the *payor* spouse that legal or business impediments, or some overriding social policy, prevent completion of the distribution within the six-year period." *Lawing v. Lawing*, 81 N.C. App. 159, 184, 344 S.E.2d 100, 116 (1986). Additionally, "[w]ith the requirement that the payor spouse make a showing that grounds exist for extending the period of payment beyond six years is a concurrent duty on the part of the trial court to affirmatively find the existence of such grounds." *Harris*, 84 N.C. App. at 363, 352 S.E.2d at 876. Providing further guidance, this Court stated in *Lawing* that:

> Awards for periods longer than six years, if necessary, should be crafted to assure completion of payment as promptly as possible. This will serve both statutory goals: affording the recipient's share non-recognition treatment under the [Internal Revenue] Code, and fairly wrapping up the marital affairs as quickly and certainly as possible.

*Lawing*, 81 N.C. App. at 184, 344 S.E.2d at 116. Except for this restriction concerning the length of payment of the distributive award, the structure and timing of payment of the award rests with the discretion of the court. *See Sonek*, 105 N.C. App. 247, 412 S.E.2d 917; *Lawing*, 81 N.C. App. 159, 344 S.E.2d 100.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

The judgment here reflects a conscientious and thorough effort by the trial court to fashion a fair and reasonable means of payment of the distributive award owed plaintiff. The court found, among its numerous detailed findings made concerning the distributive award, that the total amount of the award could not be paid within the six year period after the date of the parties' divorce because of: (1) certain legal impediments to transfer; (2) business impediments to transfer; (3) disputes concerning the value of the property owned at the time of the cessation of the marriage; and (4) "other factors." As the "other factors" found by the court preventing payment of the award within the six year period, the court noted that defendant did not have the present liquidity or ability to pay the award within that time, and that a reasonable social policy does not require the forced dissolution and liquidation of a substantial marital estate in order to effectuate complete payment of a distributive award within a six year period.

The court further addressed in detail defendant's ability to pay the distributive award as ordered. The court found that defendant has the ability to make substantial monthly payments and to pay the distributive award within the time required by the court; that given defendant's age (63 when the judgment was entered), a reasonable period in which to accomplish transfer of the distributive award as promptly as possible is ten years, or 120 months; and that this period of time for payment of the award is a reasonable period that assures completion of the payment as promptly as possible under the circumstances. The court further found:

962. That, for many years, the Defendant has had, and has made use of, access to the substantial net incomes of, and borrowing capacities of, the various businesses owned by him.

963. That, as an example, the Defendant has caused Sonic Financial Corporation to loan to him, only since the date of separation, approximately $2,000,000, these monies not being connected with other financings related to the acquisition of new assets, such as Atlanta Motor Speedway, Inc.

964. That the Defendant . . . has a personal net value of such magnitude that he is capable of borrowing substantial amounts, and maintaining the payments involved, to a degree substantially in excess of what would normally be supported by his claimed primary earned income from one of the sub-

sidiaries of Sonic Financial Corporation. A review of his tax returns show even declared income far in excess of his claimed salary.

965. That the Defendant has the ability to obtain, either from sale of assets distributed to him herein which are more liquid by their nature, or by borrowings, or by a combination of the two, the sum of $2,144,971 [the amount of the lump sum portion of the award] within 75 days from the filing date of this judgment.

The findings made by the court regarding the need to extend payment of the distributive award over a period in excess of six years after the date of cessation of the marriage and regarding defendant's ability to pay the award are adequately supported by the record and sufficiently support the award as ordered, including the structure and timing of the award. We find no abuse of discretion in the means by which the court ordered the distributive award to be paid. To the contrary, the means chosen reflects a careful balancing of the respective interests of the parties. Accordingly, we reject the parties' arguments concerning the distributive award.

## DISPOSITION

In summary, we discern no reversible error in, and specifically affirm, that part of the judgment addressing the classification and valuation of the property owned by the parties. We find reversible error, however, in the court's failure to consider defendant's receipt of dividend income of $240,162 after the date of separation as a factor in determining an equitable distribution and in the court's calculation and treatment of the postseparation appreciation of the marital property, including the credit given defendant for his discharge of the second mortgage on the marital home. We therefore vacate that part of the judgment addressing distribution of the marital property and remand this case to the trial court for redetermination of what constitutes an equitable distribution of the marital property and entry of a new judgment consistent with this opinion and correcting the errors identified herein. In so doing, the court shall rely on the existing record, as a new trial on these issues is not needed, but may hear additional arguments from the parties and take such additional evidence as the court finds necessary to correct the errors identified herein.

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

Affirmed in part, vacated in part, and remanded.

Judge COZORT concurs.

Judge GREENE concurs in part and dissents in part.

Judge GREENE concurring in part and dissenting in part.

I do not agree with the majority that it "is not essential" for the trial court to specifically characterize as active, when such evidence is presented at trial, increases in the value of marital property occurring after the date of separation which are attributable to the acts of one spouse. Otherwise, I fully concur with the majority's treatment of the issues raised in this appeal.

"In determining whether a particular distribution [of marital property] will be equitable, the judge must [to the extent evidence is presented] consider the statutory equitable factors set out in Section 50-20(c)." *McIver v. McIver,* 92 N.C. App. 116, 127, 374 S.E.2d 144, 151 (1988). To insure that due consideration has been given by the trial court to the evidence relating to any of the Section 50-20(c) factors, the findings must so reflect. *Id.; Armstrong v. Armstrong,* 322 N.C. 396, 405, 368 S.E.2d 595, 600 (1988). When evidence is presented of a postseparation increase in the value of marital property, the judgment must include findings reflecting this evidence and the increase must be considered by the trial court as a "distributional factor." *Truesdale v. Truesdale,* 89 N.C. App. 445, 450, 366 S.E.2d 512, 516 (1988). In this context, consideration as a "distributional factor" requires that the party not receiving the asset which has increased in value be given some favorable consideration by the trial court in its determination of how to apportion the marital property between the parties in an equitable manner.

Evidence of the "[a]cts of either party to maintain, preserve, develop, or expand . . . marital property, during the period after separation . . . and before the time of distribution" is a specific statutory distributional factor, as is evidence of acts of either party "to waste, neglect, [or] devalue" the marital property. N.C.G.S. § 50-20(c)(11a) (Supp. 1992). Any resulting increase (or decrease) in the value of marital property is "active" in nature, as that term has been used in the context of increases in the value of separate property occurring during the marriage. *See Ciobanu v. Ciobanu,*

SMITH v. SMITH

[111 N.C. App. 460 (1993)]

104 N.C. App. 461, 465, 409 S.E.2d 749, 752 (1991) (increases in value of separate property attributable to contributions of marital estate are active). Pursuant to *Armstrong*, to the extent evidence is presented that either party has, after the date of separation, taken some action that causes the value of the marital property to increase (or decrease) in value, this evidence must be considered by the trial court in its determination of what is an equitable distribution and findings must be entered to reflect such consideration. *See Mishler v. Mishler*, 90 N.C. App. 72, 77, 367 S.E.2d 385, 388, *disc. rev. denied*, 323 N.C. 174, 373 S.E.2d 111 (1988) ("where there is evidence of active . . . appreciation of the marital assets after [the date of the parties' separation], the court must consider such appreciation as a factor under G.S. 50-20(c)(11a) or (12), respectively").

In the instant case, the trial court, as reflected in its judgment, determined the increase or decrease in the value of each item of marital property occurring after the date of the parties' separation. Specifically raised by defendant is the court's finding reflecting an increase in the value of the marital portion of Sonic Financial Corp. in the amount of $13,594,000.00 between the date of separation and the date of trial. Significantly, as defendant argues in his brief, the trial court did not determine the extent to which this increase is attributable to the actions of defendant, despite the fact that ample evidence thereof was presented at trial. This was error, and on remand the trial court should also make findings regarding the extent to which the postseparation increase in the value of Sonic is attributable to defendant's actions and consider that in making an equitable distribution of the marital property.