JAYSHREE KHAJANCHI, PLAINTIFF v. KIRIT A. KHAJANCHI, DEFENDANT

No. COA99-1056

(Filed 21 November 2000)

## 1. Divorce— equitable distribution—unequal division proper

The trial court did not abuse its discretion in an equitable distribution case asserted prior to the divisible property amendments in 1997 by distributing the marital estate unequally by $200,000 more in property in favor of defendant-husband and by giving each party two Hallmark stores even though plaintiff-wife requested all four stores, because: (1) the trial court specifically found that the four Hallmark stores owned by the parties had

greatly appreciated in value since the date of separation, and the appreciation was due to the efforts of defendant; (2) the trial court noted the forty-six percent increase in the value of the four Hallmark stores was created by active appreciation attributable to the post-separation efforts of defendant; (3) the trial court considered as a distributional factor that defendant incurred considerable financial losses from the date of separation onward due to the forced sale of the parties' Georgia residence and his payments of numerous marital debts; (4) the trial court distributed all the other marital debts to defendant and balanced this allocation by distributing additional assets to defendant; (5) the trial court made an interim distribution of $180,000 to plaintiff from the marital assets of the parties; and (6) the trial court distributed two Hallmark stores to each party after considering store locations, the parties' requests, the parties' conduct, and the economic ramifications of each combination.

## 2. Divorce— equitable distribution—distributional factors—discretion of trial court

The trial court did not abuse its discretion in an equitable distribution case asserted prior to the divisible property amendments in 1997 by failing to classify and distribute as marital debt the sales cost and income taxes incurred in connection with the sale of the parties' Georgia real estate, because: (1) even if post-separation debt payments are treated as a distributional factor, the trial court may in its discretion choose to give no weight to that particular factor; and (2) defendant was not prejudiced in any way by the trial court's actions since those distributional factors resulted in an unequal distribution in his favor.

## 3. Divorce— equitable distribution—marital debts

The trial court did not err in an equitable distribution case asserted prior to the divisible property amendments in 1997 by its distribution of the assets and debts of the parties' Hallmark stores even though defendant-husband contends the trial court should have used the same method it used for the division of a Wachovia Bank checking account when it distributed the stores' debts owed to Hallmark, Enesco, and Lefton, because: (1) the trial court chose to distribute the amount of the Enesco and Lefton invoices equally since it had no way of determining from the evidence how much of the inventory was in the two stores distributed to plaintiff-wife; (2) neither party chose to incur the expense of a complete inventory to determine whether the mer-

chandise in question was in existence and in which store it was located; and (3) defendant had no objection to an equal division of the Enesco or Lefton accounts at trial.

Appeal by both plaintiff and defendant from judgment entered 8 January 1999 by Judge Shelly S. Holt in New Hanover County District Court. Heard in the Court of Appeals 14 August 2000.

Jayshree Khajanchi (plaintiff) and Kirit A. Khajanchi (defendant) were married on 26 November 1968, separated on 29 February 1996, and divorced on 1 August 1997. Their two children are emancipated. Prior to the entry of their divorce judgment, both plaintiff and defendant asserted claims for equitable distribution of their marital property and debts.

Plaintiff and defendant moved to Wilmington, North Carolina, in 1981. In 1986, the parties purchased a Hallmark franchise (Jay's Hallmark) in Wilmington. Plaintiff-wife operated the business until 1991, when defendant-husband began working in the store with her. In mid-1993, the parties purchased three Hallmark stores in Myrtle Beach, South Carolina. Following the separation of the parties, defendant operated all four Hallmark stores, receiving a salary, bonuses, and other benefits from his management of the stores. Prior to the trial of the equitable distribution claims, the wife received $180,000.00 in interim distributions.

In addition to the four Hallmark stores, on the date of separation the parties also owned a home in Wilmington, another residence in Georgia, and a condominium at Wrightsville Beach. Their personal property included three automobiles, numerous IRAs and other investment accounts, checking accounts, household furnishings, jewelry, Hallmark "collectibles," and a life insurance policy with cash value.

The trial court valued the marital assets of the parties at $2,591,155.00 and the marital debt at $694,940.00 on the date of separation. After hearing evidence on various distributional factors, the trial court concluded that an equal distribution would not be equitable, and ordered an unequal distribution in favor of defendant-husband. Both parties appealed.

*Lea, Clyburn & Rhine, by J. Albert Clyburn and James W. Lea, III, for plaintiff appellant-appellee.*

*Carlton S. Prickett, Jr., for defendant appellant-appellee.*

KHAJANCHI v. KHAJANCHI

[140 N.C. App. 552 (2000)]

HORTON, Judge.

The division of property between married persons following separation or divorce was relatively simple in North Carolina before the enactment of the Equitable Distribution Act in 1981. Prior to that time, this State was one of a dwindling group of common law "title" jurisdictions, in which property was assigned to the spouse holding its "title." In most cases, that spouse was the husband. Typically, only real property was jointly titled to the spouses. Although the number of women in the work force increased after the end of World War II, the husband's employment was still likely to be the primary source of income for the parties, and any deferred compensation or retirement benefits were "owned" by him. The title system of allocation "tended to reward the spouse directly responsible for its acquisition, while overlooking the contribution of the homemaking spouse." *White v. White*, 312 N.C. 770, 774, 324 S.E.2d 829, 831 (1985). *See also* 3 Suzanne Reynolds, *Lee's North Carolina Family Law* § 12.5, at —— (forthcoming publication, 5th ed. December 2000); Sally B. Sharp, *Equitable Distribution of Property in North Carolina: A Preliminary Analysis*, 61 N.C.L. Rev. 247 (1983).

The common law "title" system was not only unfair, but also spawned unnecessary litigation. Dependent spouses routinely made claims for alimony and requested possession of the dwelling house and its contents, and absolute divorces were often contested to encourage a more reasonable property settlement. However,

> [w]ith the advent of no-fault divorce, dependent spouses lost the "bargaining power" of refusing to consent to a divorce. . . . The combination of no-fault divorce and a "title only" rule for property distribution sometimes led to unconscionable results. *See, e.g., Leatherman v. Leatherman*, 297 N.C. 618, 256 S.E.2d 793 (1979) (wife worked in home and in husband's closely held corporation for many years but could receive only one-half the marital home upon divorce under prevailing legal theories). Pressure mounted for North Carolina to follow the lead of other states in adopting statutes based on community property or equitable distribution principles. . . . The General Assembly responded in 1981 by enacting "An Act for Equitable Distribution of Marital Property," codified as N.C.G.S. §§ 50-20, -21.

*McLean v. McLean*, 323 N.C. 543, 549, 374 S.E.2d 376, 380 (1988).

Equitable distribution, as enacted in North Carolina, was grounded in the notion that marriage is a partnership enterprise, both economic and otherwise, "to which both spouses make vital contributions and which entitles the homemaker spouse to a share of the property acquired during the relationship." *White,* 312 N.C. at 775, 324 S.E.2d at 832. "In other words, '[t]he goal of equitable distribution is to allocate to divorcing spouses a fair share of the assets accumulated by the marital partnership.' The heart of the theory is that 'both spouses contribute to the economic circumstances of a marriage, whether directly by employment or indirectly by providing homemaker services.' " *Smith v. Smith,* 314 N.C. 80, 86, 331 S.E.2d 682, 686 (1985) (citations omitted). Thus, the Act authorized our state's district courts to consider factors other than legal title in distributing the marital assets upon the dissolution of the marriage. In keeping with this statutory mandate, we have stated that "the policy behind G.S. 50-20 is basically one of repayment of contribution." *Hinton v. Hinton,* 70 N.C. App. 665, 669, 321 S.E.2d 161, 163 (1984).

In an effort to equitably account for post-separation events, the Equitable Distribution Act was amended in 1997 to add the category of "divisible" property. 1997 N.C. Sess. Laws ch. 302, §§ 2-5. As a result of those amendments, the trial courts were directed to classify, value and distribute certain real and personal property received after the date of separation, including the appreciation and diminution in the value of marital property, passive income from marital property, and certain increases in marital debt. N.C. Gen. Stat. § 50-20(b)(4) (1999). The 1997 amendments were effective 1 October 1997 and applied to actions for equitable distribution filed on or after that date. The claims for equitable distribution in this case were asserted prior to the effective date of the amendments relating to "divisible property"; thus our discussion below is confined to our statutory and case law as it existed prior to the enactment of the 1997 amendments.

Upon a party's application for equitable distribution, the trial court is to determine what is "marital" property and provide for an equitable distribution of such property. N.C. Gen. Stat. § 50-20(b)(1) (definition of marital property); N.C. Gen. Stat. § 50-20(c); *Truesdale v. Truesdale,* 89 N.C. App. 445, 448, 366 S.E.2d 512, 514 (1988). The court's task is divided into three parts: classification, valuation, and distribution. *Cable v. Cable,* 76 N.C. App. 134, 137, 331 S.E.2d 765, 767, *disc. review denied,* 315 N.C. 182, 337 S.E.2d 856 (1985).

At the classification stage, the court must determine whether the property was acquired during the marriage by the efforts of one or

KHAJANCHI v. KHAJANCHI

[140 N.C. App. 552 (2000)]

both spouses, or whether it is the separate property of one spouse. Marital debts must likewise be classified. "[O]nly those assets *and* debts that are classified as marital property and valued are subject to distribution under the Equitable Distribution Act . . . ." *Grasty v. Grasty*, 125 N.C. App. 736, 740, 482 S.E.2d 752, 755, *disc. review denied*, 346 N.C. 278, 487 S.E.2d 545 (1997) (emphasis added). After classification, the items of marital property must be valued as of the date of the separation of the parties, since the marital estate is "frozen" at that time. *Becker v. Becker*, 88 N.C. App. 606, 607, 364 S.E.2d 175, 176 (1988). A net value for each item must be reached by considering the "market value, if any, less the amount of any encumbrance serving to offset or reduce market value." *Alexander v. Alexander*, 68 N.C. App. 548, 551, 315 S.E.2d 772, 775 (1984). Finally, the court must distribute the marital property and debts in an "equitable" manner between the parties. *Beightol v. Beightol*, 90 N.C. App. 58, 367 S.E.2d 347, *disc. review denied*, 323 N.C. 171, 373 S.E.2d 104 (1988).

Here, the parties do not take exception to any findings of fact or conclusions of law with regard to the trial court's classification and valuation of any property or debts. Their objections are to the distribution of the marital property, particularly the four Hallmark stores owned by them.

## I. Plaintiff's Appeal

Plaintiff-wife appeals from the decision of the trial court to distribute the marital estate unequally in favor of defendant-husband. She contends that, in light of the distributional factors found by the trial court, the trial court abused its discretion in ordering an unequal distribution. After careful review, we disagree and affirm the trial court.

The North Carolina Equitable Distribution Act is

a legislative enactment of public policy so strongly favoring the equal division of marital property that an equal division is made *mandatory* "unless the court determines that an equal division is not equitable." N.C.G.S. 50-20(c). The clear intent of the legislature was that a party desiring an unequal division of marital property bear the burden of producing evidence concerning one or more of the twelve factors in the statute and the burden of proving by a preponderance of the evidence that an equal division would not be equitable. Therefore, if no evidence is admitted

tending to show that an equal division would be inequitable, the trial court *must* divide the marital property equally.

> When evidence tending to show that an equal division of marital property would not be equitable is admitted, however, the trial court must exercise its discretion in assigning the weight each factor should receive in any given case. It must then make an equitable division of the marital property by balancing the evidence presented by the parties in light of the legislative policy which favors equal division.

*White,* 312 N.C. at 776-77, 324 S.E.2d at 832-33.

As *White* indicates, the party who desires an unequal division bears evidentiary burdens concerning the relevant statutory factors, and also has the burden of proving by a preponderance of the evidence that an equal division would not be equitable. These burdens become even more significant when we consider the fact that the trial court has broad discretion in determining the weight to be accorded to statutory factors and in distributing the marital estate. *Alexander,* 68 N.C. App. at 552, 315 S.E.2d at 775-76. If the trial court divides property unequally, it must make findings of fact based on the evidence in support of its conclusion that an equal division would not be equitable. *Id.*

The trial court's decision "will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *White,* 312 N.C. at 777, 324 S.E.2d at 833. See also *Rawls v. Rawls,* 94 N.C. App. 670, 676, 381 S.E.2d 179, 182 (1989) (stating that the manner in which the court distributes or apportions marital debts is a matter committed to the discretion of the trial court); *Smith v. Smith,* 111 N.C. App. 460, 433 S.E.2d 196 (1993), *rev'd on other grounds,* 336 N.C. 575, 444 S.E.2d 420 (1994) (upholding trial court's distribution where trial court found the presence of a factor but stated in the final order that it chose not to give any weight to that factor). A single distributional factor can support an unequal distribution of the marital property and debts. *Andrews v. Andrews,* 79 N.C. App. 228, 235, 338 S.E.2d 809, 814, *disc. review denied,* 316 N.C. 730, 345 S.E.2d 385 (1986).

The trial court's distribution will not be disturbed on appeal absent evidence that it is manifestly unsupported by reason. *Lawing v. Lawing,* 81 N.C. App. 159, 162, 344 S.E.2d 100, 104 (1986). See also *Nix v. Nix,* 80 N.C. App. 110, 341 S.E.2d 116 (1986) (upholding trial

court's award of 100% of the marital estate to one party due to a finding that significant post-separation appreciation of one marital asset had accrued to the benefit of the other party), and *Godley v. Godley*, 110 N.C. App. 99, 429 S.E.2d 382 (1993) (affirming trial court's award of 90% of the marital estate to one party based upon the presence of several distributional factors).

During their marriage, the Khajanchis acquired four Hallmark stores: Jay's Hallmark in Wilmington, North Carolina, and the Briarcliff, Myrtle Square and Inlet Square stores in Myrtle Beach, South Carolina. The Khajanchis incurred significant debt to purchase these stores, and those debts were still in existence when the marriage ended in 1996. In addition, there were mortgage debts on each of the Khajanchis' three residences, as well as an automobile debt. The trial court was primarily concerned with distributing these marital debts and the four Hallmark stores during the equitable distribution proceeding.

After careful consideration of the evidence, the trial court determined that "an equal division of the marital estate is not equitable. Rather, an unequal distribution of the marital estate in favor of Defendant, as set forth herein, is equitable." The trial court then distributed about $200,000.00 more in property to defendant-husband than to plaintiff-wife. The effect of the division was that the defendant received $100,000.00 more than he would have received under an equal division.

**[1]** The plaintiff contends that the trial court erred in making an unequal division of the marital assets, that the trial court improperly considered as distributional factors certain post-separation payments made by defendant, and that the trial court improperly distributed the four Hallmark stores, because plaintiff requested all four Hallmark stores and was given only two of them. We disagree with each of plaintiff's arguments.

Because of post-separation changes in the value of property, our trial courts were often required—prior to the 1997 amendments—to make an unequal distribution in order to achieve equity. "If the court determines that an equal division of the marital property is not equitable, the court shall divide the marital property . . . equitably." N.C. Gen. Stat. § 50-20(c). See also *White*, 312 N.C. at 777, 324 S.E.2d at 833 (stating that the trial court must exercise its discretion in considering the factors in N.C. Gen. Stat. § 50-20(c) and then make an

equitable division of the marital property once it determines that an equal division is inequitable.)

Here, the able trial judge meticulously considered a host of distributional factors, such as the value of separate property owned by the parties and the value of business interests acquired by them after the date of separation. As part of its detailed order, the trial court made the following findings:

17. After the parties['] separation and at the time of trial, each party had acquired additional assets which are hers or his separate property: Plaintiff-Wife now owns a 50% interest in five (5) Taco Bell restaurants in California and Defendant-Husband now owns the "Jacksonville" Hallmark store.

18. In 1997, the five (5) Taco Bell restaurants in which Plaintiff has a 50% interest earned a total net profit of $300,000.

19. From December 31, 1997, through January 20, 1998, the Defendant had control of bank accounts, both business and personal, which collectively may have had as much as $918,000 on deposit; however, at the time of trial it was shown that there were several outstanding checks and other payments which Defendant had made from these accounts which were not reflected on the account balances shown by Plaintiff and therefore the total balance in these accounts at trial was closer to approximately $350,000.

20. Of the approximate $350,000 which Defendant had on deposit at the time of trial in the various accounts, approximately $152,000 was in a personal savings account . . . and represented payments received by him from two (2) bonuses in 1997 of $100,000 each from the Wilmington store and the three (3) Myrtle Beach stores less his payment of $45,000 for estimated income taxes on these bonuses.

21. Two (2) of the bank accounts which were included in the evidence offered by Plaintiff that Defendant had approximately $918,000 at the time of trial were bank accounts which were opened after the date of separation . . . .

. . . .

26. Defendant preserved marital assets after the parties' separation by paying the monthly payments on the mortgages, and by also paying off the mortgage on the Georgia residence at the time

of its sale; by making the payments on the Ford Explorer debt; and by making the monthly payments on the "Hallmark debt".

27. After the separation, the Defendant paid the sum of $4,987 to or on behalf of Plaintiff . . . .

28. After the parties' separation, the "Georgia house" was sold in December, 1996 . . . . Defendant incurred $6,631 in "closing costs" and $31,985 for income taxes arising from the sale of this property . . . .

29. After the date of separation, the Defendant liquidated [an investment account]. As a result of this sale, Defendant incurred an income tax liability of $24,000.

30. After the date of separation, [the Plaintiff received an interim distribution of $180,000].

31. Any distributional payment by Defendant to Plaintiff would be with "after-tax dollars" of Defendant and would be non-taxable to Plaintiff.

. . . .

33. Since the parties' separation the Defendant has had the sole responsibility for managing and maintaining all four of the Hallmark stores.

. . . .

37. The increase in value of these four (4) stores to $2,062,890 at the time of trial, being an almost forty-six percent (46%) increase in value from their total value of $1,415,366 at the date of separation, is active appreciation attributable primarily to the post-separation efforts of Defendant.

. . . .

39. . . . The principal amount owed [on the "Hallmark debt"] was reduced from $418,469 at the date of separation to $256,145 as of the date of trial, with this reduction in the balance being the result of payments made by Defendant after separation and up to the date of trial. . . .

. . . .

43. The division and distribution of the four (4) stores, . . . is based on location as well as gross sales from 1997. Defendant-

husband lives in Wilmington and the Briarcliff store is the closest store to the Wilmington store. The Myrtle Square and Inlet Square stores had 48% of the gross sales of the four stores in 1997. The Court finds this division and distribution of the stores to be equitable if Defendant is assigned the entire Hallmark debt.

44. The Defendant-husband is being assigned all marital debt.

The trial court specifically found that the four Hallmark stores had greatly appreciated in value since the date of separation, and the court found that the appreciation was due to the efforts of the defendant-husband. At the date of separation, the four stores were collectively worth $1,415,366.00. The trial court also found that:

36. The date of trial values for the four Hallmark stores are as follows:

| a. Wilmington (Jay's Hallmark) | $ 815,040 |
|---|---|
| b. Briarcliff (MyrBch) | 413,787 |
| c. Myrtle Square (MyrBch) | 467,819 |
| d. Inlet Square (MyrBch) | 366,244 |

**TOTAL . . . $ 2,062,890**

The trial court noted that this change represented an increased value of nearly forty-six percent and was created by "active appreciation attributable primarily to the post-separation efforts of Defendant. For example, after the parties separated the Defendant not only managed these stores without assistance from Plaintiff but he also remodeled the Wilmington store and doubled the size of the Myrtle Square store."

The trial court also considered as a distributional factor that defendant incurred considerable financial losses from the date of separation onward because of the forced sale of the Georgia residence and his payments of numerous marital debts. Plaintiff contends the trial court's consideration of these facts was error. However, after examining the record, we disagree and find the trial court properly weighed the factors.

The judge distributed the Georgia house to defendant at $88,000.00, its date-of-separation value. The house was sold by defendant before the final equitable distribution order was entered. However, defendant did not actually receive the entire $88,000.00

KHAJANCHI v. KHAJANCHI

[140 N.C. App. 552 (2000)]

realized from the sale. From that amount, defendant paid $5,298.00 in repair costs to prepare the house for sale, $6,631.00 in sales costs, and $31,985.00 in income taxes on the sale proceeds.

Further, the trial court distributed all the other marital debts to defendant. Defendant-husband incurred a substantial income tax liability of $24,000.00 when he liquidated the couple's 20th Century money fund/investment account after the date of separation to pay bills and expenses associated with his management of the Hallmark stores. The trial court also made an interim distribution of $180,000.00 to plaintiff from the marital assets of the parties. These payments were also properly taken into consideration by the trial court in making its distributional decision. To balance the allocation of these debts to defendant-husband, the trial court distributed additional assets to defendant. This was within the trial court's discretion under our decision in *White*, and was not an abuse of discretion.

Faced with the task of actually dividing the four stores between the parties, the trial court assessed numerous distributive scenarios by evaluating store locations, the parties' requests, the parties' conduct, and the economic ramifications of each combination. The trial court stated that it was initially inclined to distribute all four stores to defendant, since he operated all of them from the date of separation to the time of trial; however, the trial court also considered the plaintiff's request for continued involvement in the businesses. The trial court ultimately distributed the Wilmington and Briarcliff stores to defendant and the Myrtle Square and Inlet Square stores to plaintiff. This was a permissible distribution, because we have previously held that "there appears to be no other guide than the discretion and good conscience of the trial judge in determining which party gets which specific property." *Andrews*, 79 N.C. App. at 236, 338 S.E.2d at 814. Based on the findings of fact made by the trial court, we hold the trial court did not abuse its discretion in making its distributional decision, nor did it abuse its discretion in distributing two of the four Hallmark stores to each of the parties.

## II. Husband's Appeal

[2] Defendant-husband first contends that the trial court erred in failing to classify and distribute as marital debt the sales cost and income taxes incurred in connection with the sale of the Georgia real estate. We disagree. As discussed above in section I of this opinion, defendant-husband incurred substantial expenses in connection with the sale of the Georgia real estate, including $5,298.00 for repairs,

$6,631.00 in closing costs, and income tax liability on the sale proceeds of $31,985.00. The trial court distributed the property to defendant-husband at the gross sales price, treated the outstanding mortgage as a marital debt, and treated the other expenditures by defendant-husband as distributional factors.

Prior to the enactment of the divisible property amendments in 1997, the trial court had wide latitude in dealing with debts incurred in connection with the sale or maintenance of jointly owned real estate. Generally speaking, the manner in which the trial court distributes or apportions marital debts is a matter committed to the trial court's discretion. *Rawls*, 94 N.C. App. at 676, 381 S.E.2d at 182. That exercise of discretion is given considerable weight by this Court. For example, in *Truesdale*, we stated that the trial court can award adjustive credits as part of an overall marital property distribution. *Truesdale*, 89 N.C. App. at 450, 366 S.E.2d at 516. See also *Hendricks v. Hendricks*, 96 N.C. App. 462, 386 S.E.2d 84, *cert. denied*, 326 N.C. 264, 389 S.E.2d 113 (1990) (post-separation payments made by a spouse may be treated as credits for that spouse's equitable share of the marital estate).

Post-separation payments may also be treated as a distributional factor. *Haywood v. Haywood*, 106 N.C. App. 91, 96, 415 S.E.2d 565, 568 (1992), *rev'd in part and remanded on other grounds*, 333 N.C. 342, 425 S.E.2d 696 (1993). However, even if post-separation debt payments are treated as a distributional factor, the trial court may, in its discretion, choose to give no weight to that particular factor. *Smith*, 111 N.C. App. at 510, 433 S.E.2d at 226. Here, the trial court had discretion to treat defendant's post-separation payments of the Hallmark debt, the mortgage payments, the car payments, and other marital debts as distributional factors. Defendant-husband was not prejudiced in any way by the action of the trial court because those distributional factors resulted in an unequal distribution in his favor.

[3] Second, defendant argues that the trial court erred in its distribution of the assets and debts of the Hallmark stores. Specifically, defendant complains that the trial court was inconsistent in its division of a Wachovia Bank checking account, and store debts owed to Hallmark, Enesco, and Lefton. We disagree, and affirm the action of the trial court.

From the date of separation through 12 May 1998, defendant-husband operated all four Hallmark stores. Pursuant to the order of equitable distribution, plaintiff began operating two of the Myrtle Beach

stores, Inlet Square and Myrtle Square, on 13 May 1998, and defendant began operating the remaining Myrtle Beach store and the remaining Wilmington store on that date. The Wilmington store, Jay's Hallmark, was a sole proprietorship, while the three Myrtle Beach stores were owned by AJITS, Inc., a corporation formed by the Khajanchis. Proceeds from the three Myrtle Beach stores were deposited in a checking account at Wachovia Bank, which had a net balance of $32,877.00 on 12 May 1998. The trial court prorated the checking account balance between plaintiff and defendant based on the date of trial values of the three Myrtle Beach stores, distributing 66.7% of the account to plaintiff and the remaining 33.3% to defendant. Defendant-husband does not quarrel with that division, but complains that the trial court abused its discretion in failing to use the same method in distributing the debts owed to Hallmark, Enesco, and Lefton by the three Myrtle Beach stores.

As to the debts owed to Enesco and Lefton, the trial court found:

55. Enesco supplies both "everyday" merchandise as well as "seasonal" merchandise and the $5,854 owed to Enesco may be for merchandise which was in Plaintiff's two (2) stores when she took over the management on May 13. The parties should share equally in the payment of this total bill.

56. The $2,803 owed to Lefton represents invoices which predate May 13 and are for "everyday" merchandise which may or may not have been in Plaintiff's two stores when she took control of these stores. The parties should share equally in the payment of this total bill.

It appears that the trial judge had no way of determining from the evidence how much of the inventory represented by the Enesco and Lefton invoices was in the two Myrtle Beach stores distributed to plaintiff on May 13. Therefore, the trial judge chose to distribute the amount of the invoices equally. In that action we find no error.

We first note that, if anyone was prejudiced by the ruling of the trial court, it was plaintiff because the trial judge could not say with any certainty whether the invoiced merchandise was in her two stores. However, plaintiff did not appeal from these findings by the trial court. "Where no exceptions have been taken to the findings of fact, such findings are presumed to be correct and are binding on appeal." *Dull v. Dull*, 265 N.C. 562, 563, 144 S.E.2d 587, 588 (1965).

Second, neither party chose to incur the expense of a complete inventory to determine whether the merchandise in question was in existence on 13 May 1998 and in which store it was located. It is well settled that the party advocating an unequal division in an equitable distribution proceeding has the burden of showing, by a preponderance of the evidence, an error in the trial court's disposition. *White*, 312 N.C. at 776-77, 324 S.E.2d at 832-33. The burden in this case is on defendant to show such error. He cannot meet this burden by relying on his own failure to provide evidence from which the trial court could make a more definitive ruling.

Finally, it appears that at the trial of the matter defendant had no objection to an equal division of the Enesco or Lefton accounts. When defendant was asked about these accounts at a hearing on 7 December 1998, the following exchange occurred:

Q. And what is your position then on Anesco? [sic]

A. I feel that since a lot of this merchandise is, you know, not sold I'd be willing to share half of it if I had to.

Q. That's your position on Anesco? [sic]

A. That's right.

Q. And Lefton is $2,800.00?

A. Right.

As to the Hallmark invoice, the trial court determined that:

54. The Hallmark invoices, which Plaintiff contends Defendant owes, total $69,412; however, $42,616 of this $69,412 debt represents "Season Rebills" which are invoices for unsold "seasonal" merchandise that are not owing and due until May of 1999. The merchandise represented by these "Season Rebills" invoices was part of the inventory of Plaintiff's two stores when she took over on May 13 and may be sold in the future out of her two stores. Plaintiff should be responsible for payment of $23,514 on the "Season Rebills" invoices and Defendant should pay $19,102 on said invoices. The balance of $26,796 are for invoices which pre-date May 13 and are for merchandise received by Plaintiff's two stores prior to May 13 and which may or may not have been sold by Defendant prior to Plaintiff assuming control of these stores. Defendant should pay this $26,796 balance on invoices owed to Hallmark.

Again, the trial court made a diligent effort to account for merchandise associated with holidays and special occasions, as distinguished from everyday merchandise. As to the merchandise for holidays, the trial court apparently divided it between plaintiff and defendant, assigned to defendant the portion of the invoice based on holidays prior to 13 May 1998, and assigned the balance to plaintiff. As to the invoice for "everyday" merchandise, the trial court assigned the entire balance to defendant, apparently reasoning that the invoice represented merchandise already sold by defendant. Given the evidence and testimony presented by the parties, the trial court made an equitable distribution of the Hallmark debt and the entire marital estate. This assignment of error is overruled.

There being no abuse of discretion in the division of the marital estate and debt, the judgment of the trial court is

Affirmed.

Chief Judge EAGLES and Judge MARTIN concur.